

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-1997

# Smith v. Horn

Precedential or Non-Precedential:

Docket 96-9001,96-9002

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Smith v. Horn" (1997). *1997 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 24, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-9001 and 96-9002

CLIFFORD SMITH

v.

MARTIN HORN, COMMISSIONER, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; JAMES PRICE,
SUPERINTENDENT, OF THE STATE CORRECTIONAL
INSTITUTION AT GREENE, AND; JOSEPH P.
MAZURKIEWICZ, SUPERINTENDENT, OF THE STATE
CORRECTIONAL INSTITUTION AT ROCKVIEW

District Attorney of Bucks County,
Appellant No. 96-9001

CLIFFORD SMITH,

Appellant No. 96-9002

v.

MARTIN HORN, COMMISSIONER, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; JAMES PRICE,
SUPERINTENDENT, OF THE STATE CORRECTIONAL
INSTITUTION AT GREENE, AND; JOSEPH P.
MAZURKIEWICZ, SUPERINTENDENT, OF THE STATE
CORRECTIONAL INSTITUTION AT ROCKVIEW

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-03671)

Argued March 11, 1997

BEFORE: MANSMANN, COWEN and ALITO, <u>Circuit Judges</u>

(Filed July 24, 1997)

David D. Langfitt, Esq.
Gerard M. McCabe
Montgomery, McCracken, Walker
 & Rhoads
123 South Broad Street
Philadelphia, PA 19109

Billy H. Nolas, Esq. (argued)
Yvonne R. Bradley
Center for Legal Education
 Advocacy & Defense Assistance
437 Chestnut Street
Suite 501
Philadelphia, PA 19106

COUNSEL FOR APPELLEE/
CROSS APPELLANT

Stephen B. Harris, Esq. (argued)
Office of District Attorney
55 East Court Street
Bucks County Courthouse
Doylestown, PA 18901

COUNSEL FOR APPELLANT/
CROSS APPELLEE

**OPINION OF THE COURT**

COWEN, <u>Circuit Judge</u>.

This is an appeal from a judgment of the district court granting in part petitioner-appellee/cross-appellant Clifford Smith's petition for a writ of habeas corpus. The district court held that certain comments made by the prosecutor

2

at the penalty phase of Smith's trial for first-degree murder violated Smith's rights pursuant to the Eighth and Fourteenth Amendments. The district court further held that the failure of Smith's attorney to object to these comments violated Smith's right to the effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments. The district court rejected Smith's claim that instructions to the jury at the guilt phase of the trial, concerning the elements of first-degree murder pursuant to Pennsylvania law, violated Smith's right to a fair trial pursuant to the Due Process Clause of the Fourteenth Amendment. Similarly, the district court rejected Smith's arguments that other constitutional errors occurred at the penalty phase.

Respondents-appellants/cross-appellees ("Pennsylvania" or "the Commonwealth") contend that the district court erred in its determination that the prosecutor's closing argument at the penalty phase, and the failure of Smith's attorney to object to that argument, violated Smith's federal constitutional rights. Smith cross-appeals, contending that the district court erred in denying him habeas relief with regard to his conviction for first-degree murder, and in rejecting his other arguments for granting relief based on alleged defects at the penalty phase.

We agree with Smith that errors in the jury instructions at the guilt phase of his trial violated his rights pursuant to the Due Process Clause of the Fourteenth Amendment. We thus do not reach the district court's holding that errors at the penalty phase violated Smith's rights pursuant to the Sixth, Eighth, and Fourteenth Amendments. We also do not reach Smith's arguments concerning other claims of error that occurred at the penalty phase. Accordingly, we will vacate the judgment of the district court in part, reverse in part, and remand with directions to grant habeas relief.

I.

On November 22, 1983, in the Court of Common Pleas, Bucks County, Pennsylvania, Smith was convicted offirst-degree murder, among other crimes. The evidence at trial showed that on June 17 of that year, Smith and Roland

Alston entered a pharmacy with the intention of robbing it, that they forced three persons inside the store to lie in a prone position on the floor as they committed the robbery, and that one of the robbery victims, Richard Sharp, sustained a fatal gunshot wound to the head.

Yvette Barrow and Cheryl Yancey, who later pled guilty to being accomplices to the robbery, testified that Alston and Smith committed the robbery while Barrow and Yancey waited in Barrow's car. One eyewitness saw Alston and Smith enter and leave the pharmacy at the time of the robbery. A second eyewitness saw the pair walk in the direction of the pharmacy just prior to the robbery. A third eyewitness identified the car in which Smith and Alston were traveling just after the robbery. All three independent eyewitnesses identified the clothing worn by the robbers, which was later found at the homes of Alston, Yancey, and Frances Atkins, Smith's former girlfriend. Items taken from the three robbery victims were later found at the homes of Barrow and Yancey.

Although there was evidence that both Alston and Smith carried handguns that day, the evidence tended to show that Smith actually committed the killing. According to the Commonwealth, Barrow testified that immediately after the murder, Alston yelled at Smith, "Why did you shoot the motherf[uck]er, why did you shoot him?" Appellant's Br. at 11.1 Smith responded, "He walked into the store and he scared me -- the guy lifted his head and I had to do it, I had to do it." Id. Barrow also testified that Smith told Alston that "[s]ince [Smith] did the murder, he wanted the ring" that was one of the proceeds of the robbery. Id. Yancey similarly testified that Alston yelled at Smith, "Why did you shoot that motherf[uck]er, man? You almost shot me," to which Smith replied, "I had to." Id. She also testified

_____

1. Because Smith has not contested the version of the trial testimony related in the Commonwealth's briefs, we accept this version as accurate for purposes of this appeal. Nonetheless, we feel the need to express our bafflement at the Commonwealth's disregard of 3d Cir. LAR 30.3(a) (1993) ("Relevant portions of a trial transcript . . . referred to in the briefs shall be included in the appendix . . . ."). In light of the importance of the testimony in question to the Commonwealth's position, it cannot be disputed that this testimony is "[r]elevant."

4

that Smith stated that "he should have the ring because he's the one that killed the man." Id. There was also evidence that Smith's shoes had human blood on them. Finally, there was evidence that unfired cartridges found at Yancey's house had been loaded into and ejected from Alston's pistol, indicating that Alston's weapon had not been fired.

At the guilt phase of the trial, the district attorney made the following comments in closing argument:

[W]ho shot Richard Sharp is of no moment in this trial, because as His Honor will tell you, it makes no difference under the law and under the facts. It doesn't make one bit of difference who shot Mr. Sharp, because <u>if you find as a fact</u>, and I suggest you can based on the evidence, <u>that Richard Sharp was killed by either Roland Alston or Clifford Smith, you can find as a fact that there was murder in the first degree.</u> It makes no difference who pulled the trigger. <u>The acts of one accomplice are the acts of the other. The doings of one are the doings of the other.</u>

 . . . .

 . . . [I]t makes no difference who fired the fatal shot . . . [F]or your purposes, it doesn't make any difference. <u>The act of one is the act of the other.</u> . . .

 . . . .

 . . . [I]f you find that this defendant or both defendants or <u>either of them had the conscious purpose to take human life</u>, you can find as a matter of fact and as a matter of law that it's murder in the first degree. . . .

 . . . .

 . . . [I]f you find that either Smith or Alston fired that bullet . . . if you find that either did this, <u>both as conspirators or as accomplices are guilty of the crime of first degree murder.</u>

 . . . .

 . . . Does the evidence indicate that Clifford Smith or Roland Alston, <u>either</u> or both of them, <u>made a</u>

5

conscious decision to take human life, a willful, a deliberate, an intentional killing, no accident?

Cross App. at 1007–08, 1010, 1012–13, 1014, 1017 (emphasis added).

The court first instructed the jury on homicide without reference to any specific offense or degree:

[I]f . . . you find that Smith and Alston were accomplices of each other, then it is not important for you to determine which one actually pulled the trigger that brought about the killing of Richard Sharp, if you find beyond a reasonable doubt that one of the two did so and were [sic] acting as the accomplice of each other at the time. In order, however, to find Clifford Smith to be guilty, you need not conclude, as I said, that he was the actor; that is, if I can use the word "shooter," but he was, nevertheless, acting as an accomplice of Alston and it was his intent of promoting or facilitating that act and the killing was done in furtherance of the robberies, if you so find, then he would be guilty as though he were the actual perpetrator. . . .

 . . . [T]he Commonwealth must prove all of the elements of the case beyond a reasonable doubt, but they do not have to prove beyond a reasonable doubt which of the two, Smith or Alston, actually brought about the killing of Richard Sharp by showing who pulled the trigger and placing [sic] the shot in his head. If, and I emphasize this, you find that one was the accomplice of the other and that one of the two actually performed the killing, you, the jurors, need not agree on the role or roles played by the respective parties; that is, by this defendant and his accomplice, if you find that that was the position of both, provided that each of you is satisfied that the crime was actually perpetrated by the defendant or by the accomplice of the defendant. Conversely, if you find that one was not the accomplice of the other but that a criminal homicide occurred, then you must determine who performed the act of killing and, of course, it follows that if Alston was the killer and Smith was not his accomplice, he, Smith, would not be guilty of the crime of murder for the

6

Commonwealth has not proven this accomplice theory beyond a reasonable doubt.

Id. at 1030–31, 1031–32 (emphasis added).

The court then instructed the jury specifically on first-degree and second-degree murder:

[T]he elements of first degree murder are the unlawful killing of another person done intentionally; that is, willfully, deliberately and with premeditation, plus malice, as I will define that term to you. If these elements have been established beyond a reasonable doubt, you may, on the theory that one was the perpetrator and the other the accomplice, find Clifford Smith guilty of murder in the first degree . .. .

 . . . You may find the defendant guilty of second degree murder if you are satisfied that the following elements have been proven beyond a reasonable doubt: First, again you must find that a person caused the death of Richard Sharp. Secondly, that the defendant, or an accomplice of the defendant, was the person who killed him. Thirdly, that the killing was committed while the defendant was engaged, or an accomplice was engaged, in the commission of . . . the felony of robbery. Fourth, that the act of the defendant, or the defendant's accomplice, that brought about the killing and death of Richard Sharp was done in furtherance of that robbery. Fifth, that the killing was with malice on the part of the defendant [which] may be inferred by you if you conclude that the defendant was engaging in, or was an accomplice in, the commission or attempted commission of a felony dangerous to human life . . . .

Id. at 1035, 1035–36 (emphasis added).

The court then instructed the jury on the crime of conspiracy, without reference to a specific substantive crime:

You should . . . determine . . . whether there was the requisite intent to enter into this conspiracy to commit the robbery and the killing which the Commonwealth contends flowed therefrom or whether there was the

7

requisite intent to enter in and be the accomplice with the other in bringing this about. That is to say, did Clifford Smith agree, although not necessarily by words, but by conduct and circumstances to bring about this robbery which, in turn, led to the ultimate shooting, so the Commonwealth contends, and the killing of Richard Sharp? If so, then the major basis of conspiratorial liability exists as to him.

Id. at 1047–48 (emphasis added).

Finally, the court distinguished among the different degrees of murder:

You would . . . have to decide whether the act of the perpetrator, or his accomplice, at the time of the killing was acting [sic] with malice, as we have defined that term to you. Was he acting willfully, deliberately and with premeditation, although at that time not having the specific intent to kill, but having the specific intent to inflict grievous bodily harm upon Richard Sharp, because that really is the distinction between third degree murder and first degree murder. . . .

 If you would conclude that there was specific intent to take life, you would then have to determine if it was second degree murder, or as we call it felony murder, because it involves killing incidental to a felony. . . . [F]or persons to be accomplices in felony murder they must have a common design. In other words, the shared intent to commit that felony, the robbery in this case, and in furtherance thereof the killing was perpetrated as a natural act which flowed from the robbery itself. However, . . . even though you would conclude that there was the felony of robbery committed, but would further conclude that all of the elements of first degree murder were present, you . . . would be justified in returning a verdict of first degree murder, if you determine beyond a reasonable doubt that the killing was intentional; that is, that there was a specific conscious intent to kill and this was done willfully, deliberately, and with premeditation.

Id. at 1057–58 (emphasis added).

Smith was convicted of, inter alia, first-degree murder and conspiracy to commit murder. He was not convicted of conspiracy to commit first-degree murder. At the penalty phase of the trial, the jury found two aggravating factors and no mitigating factors. The jury imposed the death penalty, which it was required to do under these circumstances pursuant to Pennsylvania law. See 42 PA. CONS. STAT. ANN. § 9711(c)(1)(iv) (West 1982).

Smith filed a motion for a new trial, which was denied by the trial court on June 18, 1985. Smith subsequently was sentenced to death. He then appealed his conviction and sentence to the Supreme Court of Pennsylvania. On July 29, 1986, the judgment was affirmed, and Smith's petition to the Supreme Court of the United States for a writ of certiorari was denied thereafter. See Commonwealth v. Smith, 513 A.2d 1371 (Pa. 1986), cert. denied, 480 U.S. 951, 107 S.Ct. 1617 (1987) ("Smith I").

The Governor of Pennsylvania subsequently signed Smith's death warrant, fixing his execution for November 13, 1990. On October 16, 1991,[2] Smith filed a petition in the Court of Common Pleas, Bucks County, pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. ANN. §§9541-9546 (West 1996 Supp.). His execution was stayed several days later. After holding an evidentiary hearing, the court denied the petition. The Supreme Court of Pennsylvania affirmed on November 22, 1994, and the United States Supreme Court denied Smith's petition for a writ of certiorari. See Commonwealth v. Smith, 650 A.2d 863 (Pa. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1799 (1995).

In May of 1995, the Governor of Pennsylvania again signed Smith's death warrant, fixing July 11, 1995, as the date of execution. On June 30, 1995, the district court granted Smith a stay of execution. Smith subsequently filed the instant petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254 (1994). That court held an evidentiary hearing. On February 22, 1996, the court granted the petition in part and denied it in part

_____

2. The record does not indicate why Smith's execution was stayed past November 13, 1990.

on the grounds that the prosecutor's comments in summation at the penalty phase violated Smith's Eighth and Fourteenth Amendment rights pursuant to Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633 (1985), and California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446 (1983). The district court also held that the failure of Smith's counsel to object to the closing argument constituted ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments. The district court rejected Smith's contention, regarding the guilt phase, that the jury instructions on first-degree murder denied him due process. It also rejected Smith's additional arguments concerning the penalty phase that his sentence violated the federal constitution. The court ordered that Smith be either re-sentenced or released from confinement within 180 days, and stayed its order pending appeal. See Smith v. Horn, No. CIV. A. 95-3671, 1996 WL 172047 (E.D. Pa. Feb. 22, 1996).

This appeal and cross-appeal followed.

**II.**

As an initial matter, we find it necessary to address two issues raised by the dissent. The dissent suggests, for the first time, that we require the parties to brief the threshold procedural issues of exhaustion of state remedies and procedural default. See Dissent slip op. at 38, 40. We note at the outset that the Commonwealth never raised either of these issues at any time: not in the district court, not in its briefing before this Court, and not at oral argument.

**A.**

The dissent concedes that it is likely an exhaustion argument would fail on the grounds that further state review of the due process issue would be foreclosed to Smith. See id. at 37-38. Nevertheless, the dissent presses the point, arguing that this might present a case where the Pennsylvania courts would apply the narrow "miscarriage of justice" exception to the stringent requirements of the PCRA. See Doctor v. Walters, 96 F.3d 675, 681-83 (3d Cir. 1996). In Doctor, 96 F.3d at 683, we concluded that we ought to require exhaustion unless there is "no chance that

10

the Pennsylvania courts would find a miscarriage of justice."

However, in that case, the exhaustion issue was raised and addressed in the district court. See id. at 678. Where the issue was never raised in the district court, we are afforded discretion pursuant to Granberry v. Greer, 481 U.S. 129, 134, 107 S.Ct. 1671, 1675 (1987), to "determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim." See also Evans v. Court of Common Pleas, 959 F.2d 1227, 1233 (3d Cir. 1992); Brown v. Fauver, 819 F.2d 395, 398 (3d Cir. 1987). We must exercise our discretion on a case-by-case basis and with reference to the values of, not only comity and federalism, but also "judicial efficiency," Granberry, 481 U.S. at 135, 107 S.Ct. at 1675, and "the ends of justice," Keller v. Petsock, 853 F.2d 1122, 1127 & n.6 (3d Cir. 1988).

The dissent suggests that we ought to exercise our discretion in favor of requiring exhaustion in this case on the ground that it "falls squarely within" the category of cases that " `present[ ] an issue on which an unresolved question of fact or of state law might have an important bearing,' " Dissent slip op. at 36 (quoting Granberry, 481 U.S. at 134-35, 107 S.Ct. at 1675) (alteration added), and "it would be helpful to have the benefit of a decision by the Pennsylvania courts on the underlying issue of state law." Id. at 6. See Brown, 819 F.2d at 399; cf. Zettlemoyer v. Fulcomer, 923 F.2d 284, 309-10 (3d Cir. 1991). However, this case presents no "unresolved question . . . of state law." Granberry, 481 U.S. at 134, 107 S.Ct. at 1675. The only question of state law presented -- the elements of first-degree murder in Pennsylvania -- has been resolved by the Pennsylvania Supreme Court, not once but twice. See infra at 16-18. No one disputes that specific intent to kill is one of those elements. All remaining questions presented by this case -- whether there is a reasonable likelihood that the jury understood its instructions in a certain way, whether this understanding had the effect of relieving the Commonwealth of the burden of proving this element

11

beyond a reasonable doubt, and whether this error was harmless -- present issues of federal law.

Accordingly, we see no reason to delay review of this petition in order to provide briefing on an issue the Commonwealth never raised in any court and on which even the dissent concedes the Commonwealth has very little chance of succeeding.

**B.**

The dissent also suggests that we direct the parties to brief the related issue of procedural default. The dissent correctly notes that we and several of our sister circuits have held that this issue may be raised sua sponte by the court of appeals. See Dissent at 38 (citing Hull v. Freeman, 932 F.2d 159, 164 n.4 (3d Cir. 1991), overruled on other grounds by Caswell v. Ryan, 953 F.2d 853 (3d Cir. 1992), Ortiz v. Dubois, 19 F.3d 708, 714 (1st Cir. 1994), Washington v. James, 996 F.2d 1442 (2d Cir. 1993), and Hardiman v. Reynolds, 971 F.2d 500, 502-04 & n.4 (10th Cir. 1992)). Nonetheless, it is evident from these cases that whether we do so is discretionary, and that our discretion is guided by the same considerations as those discussed in Granberry. See Hull, 932 F.2d at 164 n.4; Washington, 996 F.2d at 1448-49; Hardiman, 971 F.2d at 504.

In Washington, 996 F.2d at 1449-50, the Court of Appeals for the Second Circuit recognized that it might be inappropriate for the court to raise the issue of procedural default sua sponte where " `it is evident that a miscarriage of justice has occurred' " (quoting Granberry, 481 U.S. at 135, 107 S.Ct. at 1675). The court also recognized that "miscarriage of justice" in this context should be defined somewhat more loosely than in the nonexhaustion context because "[u]nlike in exhaustion cases, if we decline to reach the merits in a procedural default case, the defendant has no further recourse to either state or federal relief." Id. at 1450. Nevertheless, the court narrowly limited the application of the miscarriage of justice exception to those cases where the habeas petitioner challenges the validity of the trial itself and not just the conviction, and those cases where the claimed federal violation was the product of malice. See id.; see also Ortiz, 19 F.3d at 715.

12

We believe, as did Judge Oakes in dissent in that case, that the court unduly limited the meaning of "miscarriage of justice" in contravention of the language of Granberry, 481 U.S. at 135, 107 S.Ct. at 1675. See Washington, 996 F.2d at 1454 (Oakes, J., dissenting). We agree with Judge Oakes, and with Judge Stahl of the Court of Appeals for the First Circuit, that " `miscarriage of justice' should include cases where the record is well developed and the merits strongly support the petitioner's claim." Id. at 1453 (Oakes, J., dissenting); see also Ortiz, 19 F.3d at 717 (Stahl, J., dissenting).

In this case, not only do the merits strongly support Smith's claim, as we shall demonstrate, but the record as it relates to the merits is as well-developed as it can be. We have been presented with the entirety of the charge delivered at Smith's trial. We can lay alongside this charge the unequivocal holdings of the Pennsylvania Supreme Court in two separate cases that specific intent to kill is an essential element of first-degree murder.

By contrast, the record with regard to the procedural default issue itself is sparse. For example, we have not been provided with the crucial jury instruction defining first-degree murder requested by Smith's trial counsel and rejected by the trial court. There is similarly nothing in the record with regard to whether Smith can show "cause" for the alleged default (such as by showing that appellate counsel was constitutionally ineffective) and "prejudice" resulting therefrom, or that the procedural rule does not provide an independent and adequate basis for precluding habeas review. See Doctor, 96 F.3d at 683. Thus, consideration of the procedural default issue at this late stage in the proceedings would likely require not simply supplemental briefing but a remand to the district court for supplemental fact finding. In these circumstances, where relief is "plainly warranted," Granberry, 481 U.S. at 135, 107 S.Ct. at 1676, and consideration of the procedural default defense would result in undue delay, see Odum v. Boone, 62 F.3d 327, 330 (10th Cir. 1995); Manlove v. Tansy, 981 F.2d 473, 476 n.4 (10th Cir. 1992), we exercise our discretion to decline to raise that defense sua sponte.

13

**C.**

With regard to both nonexhaustion and procedural default, we are also persuaded that when the state has never raised an issue in either the district court or this Court we should be even less inclined to raise it sua sponte than when the state either has raised the issue here only belatedly or has raised it in the district court but has not pursued that line of attack in the court of appeals. But see Washington, 996 F.2d at 1448 n.3 (stating that complete

failure to raise defense should be treated same as belatedly raising defense); Hardiman, 971 F.2d at 504 n.6 (same). In any of these situations, consideration of the issue contravenes our standard practice. However, where the issue has been raised either in the district court or the court of appeals, we are at least maintaining our roles as judges, addressing only the issues flagged, at some point, by the parties. Moreover, we are often aided in our endeavor by the fact that the district court has addressed the issue.

By contrast, where the state has never raised the issue at all, in any court, raising the issue sua sponte puts us in the untenable position of ferreting out possible defenses upon which the state has never sought to rely. When we do so, we come dangerously close to acting as advocates for the state rather than as impartial magistrates. See United States v. Burke, 504 U.S. 229, 246, 112 S.Ct. 1867, 1877 (1992) (Scalia, J., concurring in the judgment) ("The rule that points not argued will not be considered . . . at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one."); accord Hardiman, 971 F.2d at 505. While considerations of federalism and comity sometimes weigh in favor of raising such issues sua sponte, consideration of that other great pillar of our judicial system -- restraint -- cuts sharply in the other direction.

We certainly have the discretion to raise these issues sua sponte. As Granberry and its progeny direct, that discretion should be exercised with reference to the values of federalism and comity, judicial efficiency, and the ends of justice. In cases in which an issue has not been raised by either party in either the district court or in this Court, we

14

will decline to address the issue unless consideration of these factors clearly indicates that we should depart from our standard practice. We apply this presumption in such cases lest we subtly transform our adversarial system into an inquisitorial one.

The dissent has not persuaded us that consideration of federalism and comity, judicial efficiency, and the ends of justice clearly dictate that we consider the defenses of nonexhaustion and procedural default. Accordingly, we decline to do so.

**III.**

Smith argues that the jury instructions rendered by the trial court erroneously informed the jury that Smith could be convicted of first-degree murder even if he did not have the specific intent to kill. He asserts that the jury was incorrectly instructed that if it found beyond a reasonable doubt that one of the men had the specific intent to kill, and that Smith intended to commit the robbery that resulted in the killing, this would be sufficient to convict Smith of first-degree murder. He further argues that this instruction was incorrect under Pennsylvania law, and that this incorrect instruction violated his constitutional rights. The district court summarily rejected Smith's contention, stating: "Smith has raised several other arguments in his petition concerning both the guilt and penalty phases of his 1983 trial. These we find to be without merit." Smith v. Horn, 1996 WL 172047, at *15.

We conclude from a fair reading of the jury instructions that there is a reasonable likelihood that the jury convicted Smith of first-degree murder without finding beyond a reasonable doubt that he intended that Sharp be killed. Such an instruction is contrary to Pennsylvania law. We hold that these jury instructions had the effect of relieving the Commonwealth of its burden of proving beyond a reasonable doubt one of the elements of first-degree murder under Pennsylvania law. The delivery of these improper instructions amounted to a violation of Smith's right to a fair trial pursuant to the Due Process Clause of the Fourteenth Amendment. Finally, we hold that this

15

constitutional error was not harmless and that Smith must
be discharged unless the Commonwealth determines to
retry him for first-degree murder.

**A.**

Under Pennsylvania law, both today and at the time of
Smith's trial, an accomplice or co-conspirator in a crime
during which a killing occurs may not be convicted of first-
degree murder unless the Commonwealth proves that he
harbored the specific intent to kill. See 18 PA. CONS. STAT.
ANN. § 2502(a) (West 1983); Commonwealth v. Huffman, 638
A.2d 961, 962-63, 964 (Pa. 1994); Commonwealth v.
Bachert, 453 A.2d 931, 935 (Pa. 1982). This is so even
where the identity of the actual killer is unknown. See
Huffman, 638 A.2d at 964-65 (Papadakos, J., dissenting).
The Commonwealth need not prove that the defendant
actually performed the killing, see Commonwealth v.
Bachert, 412 A.2d 580, 583 (Pa. Super. 1979), aff'd in part,
rev'd on other grounds in part, 453 A.2d 931 (Pa. 1982), but
it must prove he intended for the killing to occur. In other
words, felony-murder simpliciter does not constitute murder
in the first degree in Pennsylvania.

In Bachert, 453 A.2d at 933-34, the evidence showed that
the defendant and a cohort committed a kidnaping and
robbery, during the course of which the cohort killed the
victim. The Pennsylvania Supreme Court wrote that to
constitute first-degree murder, the evidence had to show
beyond a reasonable doubt that the defendant harbored "a
specific intent to kill." Id. at 935. It wrote:

To determine the kind of homicide of which the
accomplice [defendant] is guilty, it is necessary to look
to his state of mind; the requisite mental state must be
proved beyond a reasonable doubt to be one which the
accomplice harbored and cannot depend upon proof of
intent to kill only in the principal.

Id. (emphasis added).

In Huffman, 638 A.2d at 962, the trial court had advised
the jury that

16

"in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person . That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and therefore you must determine if the killing was intentional."

(quoting trial transcript) (emphasis added) (alteration in original). This, the Pennsylvania Supreme Court held, was "patently erroneous" and "an outright misstatement of the law on a fundamental issue relating to culpability." Id. The court wrote that Bachert "express[ly] and unambiguous[ly]" held that an accomplice to an underlying felony that results in death could be convicted of first-degree murder only if the Commonwealth proves that the accomplice specifically intended to kill. Id. at 962-63.

The Commonwealth cites in its reply brief two cases in support of the proposition that a shared intent to enter into a conspiracy to commit a crime is sufficient to confer criminal liability for a killing that is the natural and probable result of the conspiracy, even if the killing were not shown to be specifically intended by the defendant. See Commonwealth v. Roux, 350 A.2d 867, 870 (Pa. 1976); Commonwealth v. La, 640 A.2d 1336, 1345-46 (Pa. Super. 1994). However, neither of these cases involved first-degree murder. See Roux, 350 A.2d at 868 (second-degree murder and conspiracy);3 La, 640 A.2d at 1340 (third-degree murder and conspiracy); see also Huffman, 638 A.2d at 964 n.9 (criticizing dissent for relying on cases involving manslaughter and lesser degrees of murder). As the Commonwealth unambiguously conceded at oral argument, Huffman and Bachert make clear that specific intent to commit a killing, not simply intent to commit some other

_____

3. Additionally, the events in Commonwealth v. Roux, 350 A.2d 867, 869 (Pa. 1976), took place on November 10, 1973. Before March 26, 1974, the definition of murder in the first degree in Pennsylvania included felony-murder. See 18 PA. CONS. STAT. ANN.§ 2502, Historical Note (1983). Thus, Roux would be inapposite even if the defendant there had been convicted of first-degree murder.

17

crime from which a killing results, is a prerequisite to a conviction for first-degree murder in Pennsylvania. Cf. Tison v. Arizona, 481 U.S. 137, 175 n.13, 107 S.Ct. 1676, 1697 n.13 (1987) (Brennan, J., dissenting) (listing Pennsylvania as a jurisdiction that "restrict[s] the imposition of capital punishment to those who actually and intentionally kill").

**B.**

Our analysis of jury instructions claimed to impair a constitutional right "must focus initially on the specific language challenged." Francis v. Franklin, 471 U.S. 307, 315, 105 S.Ct. 1965, 1971 (1985); see also Rock v. Zimmerman, 959 F.2d 1237, 1246 (3d Cir. 1992) (en banc). The allegedly constitutionally infirm language must be considered in the context of the charge as a whole. See Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482 (1991); Flamer v. Delaware, 68 F.3d 736, 752 (3d Cir. 1995); Kontakis v. Beyer, 19 F.3d 110, 115-16 (3d Cir. 1994). The proper inquiry is " `whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way' that violates the Constitution." Estelle, 502 U.S. at 72, 112 S.Ct. at 482 (quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198 (1990)) (emphasis added); see also Victor v. Nebraska , 511 U.S. 1, 6, 114 S.Ct. 1239, 1243 (1994); Flamer, 68 F.3d at 752.

A fair reading of the jury instructions given in this case permitted the jury to convict Smith of murder in the first degree without first finding beyond a reasonable doubt that Smith intended that Sharp be killed. Portions of the instructions are ambiguous as to the requisite finding of intent. Other portions affirmatively inform the jury that it need not find beyond a reasonable doubt that Smith specifically intended that the victim die in order for Smith to be guilty of murder in the first degree. Taken as a whole, there is a reasonable likelihood that the jury understood the instructions in this way.

One of the two portions of the jury charge that specifically mentions first-degree murder reads as follows:

[T]he elements of first degree murder are the unlawful killing of another person done intentionally; that is,

18

willfully, deliberately and with premeditation, plus malice, as I will define that term to you. If these elements have been established beyond a reasonable doubt, you may, on the theory that one was the perpetrator and the other the accomplice, find Clifford Smith guilty of murder in the first degree . .. .

Cross App. at 1035 (emphasis added). Taken in isolation, this charge might convey the idea that the jury must find that Smith harbored the specific intent to kill Sharp. This interpretation would be reasonable only if the jury were to understand the word "accomplice" to mean "accomplice in the killing," and not simply "accomplice in the robbery." Only in that way would the instructions convey the critical idea that Smith must be found to have intended to kill Sharp for Smith to be found guilty of first-degree murder.

Taken together with the remainder of the pertinent instructions, it is clear that jury was not made to understand "accomplice" in this way. In other portions of the charge, in which the trial court mentioned the killing but did not specifically discuss first-degree murder, the court generally did not clarify whether it was using "accomplice" in reference to the robbery, the killing, or both. Further, when it did make the meaning of "accomplice" reasonably clear, it appears that the court was using that term in reference to the robbery only.

For example, the court instructed:

[T]he Commonwealth must prove all of the elements of the case beyond a reasonable doubt, but [it] do[es] not have to prove beyond a reasonable doubt which of the two, Smith or Alston, actually brought about the killing of Richard Sharp by showing who pulled the trigger and plac[ed] the shot in his head. If, and I emphasize this, you find that one was the accomplice of the other and that one of the two actually performed the killing, you, the jurors, need not agree on the role or roles played by the respective parties; that is, by this defendant and his accomplice, if you find that that was the position of both, provided that each of you is satisfied that the crime was actually perpetrated by the defendant or by the accomplice of the defendant.

19

Conversely, if you find that <u>one was not the accomplice of the other</u> but that a criminal homicide occurred, then you must decide who performed the act of killing and, of course, it follows that <u>if Alston was the killer and Smith was not his accomplice, he, Smith, would not be guilty of the crime of murder</u> for the Commonwealth has not proven this accomplice theory beyond a reasonable doubt.

<u>Id.</u> at 1031–32 (emphasis added).

The court also instructed:

[I]f . . . you find that Smith and Alston were <u>accomplices</u> of each other, then it is not important for you to determine which one actually pulled the trigger that brought about the killing of Richard Sharp, if you find beyond a reasonable doubt that one of the two did so and were [sic] <u>acting as the accomplice of each other at the time</u>. In order, however, to find Clifford Smith to be guilty, you need not conclude, as I said that he was the actor; that is, if I can use the word "shooter," but he was, nevertheless, <u>acting as an accomplice of Alston</u> and it was his intent of promoting or facilitating that act and the killing was done in furtherance of the robberies, if you so find, then he would be guilty as though he were the actual perpetrator.

<u>Id.</u> at 1030–31 (emphasis added).

The jury was further instructed on "the distinction between third degree murder and first degree murder." <u>Id.</u> at 1057. Murder in the third degree occurs where "the perpetrator,[4] <u>or his accomplice</u> . . . [w]as . . . acting willfully, deliberately and with premeditation, although . . . not having the specific intent to kill." <u>Id.</u> (emphasis added). The clear implication is that first-degree murder occurs where "the perpetrator, <u>or his accomplice</u>" <u>did</u> have "the specific intent to kill."

In these portions of the charge, the court did not clarify whether "accomplice" means "accomplice in the killing,"

_____

4. The court presumably meant "the defendant": by definition, the "perpetrator" necessarily did the "acting."

20

"accomplice in the robbery," or both. The charge thus blurred the distinction between "accomplice in the robbery" and "accomplice in the killing," leading the jury to believe that an accomplice for one purpose is an accomplice for all purposes. This confusion was exacerbated when, in the course of enumerating the elements of second-degree murder, the court repeatedly used the word "accomplice" to mean "accomplice in the robbery." Without an explicit disclaimer, it is extremely unlikely that the jury understood the same word to have two different meanings when used only moments apart in the same charge. The charge thus allowed Smith to be convicted of first-degree murder if the jury found that either he or his accomplice <u>in the robbery</u> intended to kill Sharp.

Additionally, with regard to the conspiracy counts, the court instructed: "You should . . . determine . ... whether there was the requisite intent to enter into this conspiracy to commit the robbery <u>and the killing which the Commonwealth contends flowed therefrom</u> or whether there was the requisite intent to enter into and be the accomplice with the other in bringing <u>this</u> about" <u>Id.</u> at 1047 (emphasis added). In this portion of the charge, it is unclear whether one could have the "requisite intent to enter into th[e] conspiracy to commit the robbery," without also having the "requisite intent to enter into the conspiracy to commit the . . . killing which the Commonwealth contends flowed" from the robbery. It is likely that a reasonable juror would have inferred that the "requisite intent to enter into th[e] conspiracy to commit the robbery" also necessarily establishes the "requisite intent to enter into th[e] conspiracy to commit . . . the killing which . . . flowed therefrom." The court's conflation of the two independent requirements of intent was aggravated by the court's next instruction that the jury determine "whether there was the requisite intent to enter into and be the accomplice with the other in bringing <u>this</u> about," without clarifying whether the "this" referred to the robbery, the killing, or both.

The court immediately attempted to explain the above instruction, but in doing so it conveyed the impression that Smith was criminally liable for conspiracy to commit murder if he intended to enter into a conspiracy to commit <u>robbery</u>:

That is to say, did Clifford Smith agree, although not necessarily by words, but by conduct and circumstances to bring about this robbery which, in turn, led to the ultimate shooting, so the Commonwealth contends, and the killing of Richard Sharp? If so, then the major basis of conspiratorial liability exists as to him.

Id. at 1047-48 (emphasis added). The court did not clarify to which crime this "conspiratorial liability" applies; the charge was given in the context of the general conspiracy instruction. Thus, it is likely that the jury understood this charge as instructing that Smith could be found guilty of conspiracy to commit first-degree murder if he intended to commit the robbery, even if he did not intend that the killing be committed.

The closest the court came to instructing the jury that specific intent on the part of Smith was necessary to convict him of first-degree murder was the following: "[Y]ou . . . would be justified in returning a verdict of first degree murder, if you determine beyond a reasonable doubt that the killing was intentional; that is, that there was a specific conscious intent to kill and this was done willfully, deliberately, and with premeditation." Id. at 1058 (emphasis added). However, this language fails to convey the crucial point that the jury must find that Smith, as opposed to Alston, intended the killing to occur in order for Smith to be found guilty of murder in the first degree. Thus, this portion of the charge is "not rhetorically inconsistent," Rock, 959 F.2d at 1248, with the portions that convey the idea that an intent on the part of Alston to kill, coupled with Smith's participation in the robbery, rendered Smith guilty of first-degree murder.

The Commonwealth contends that we are bound by the Pennsylvania Supreme Court's determination, on Smith's direct appeal, that the instructions fairly conveyed to the jury the elements of first-degree murder. The court wrote: "We have reviewed the record in the present case and find no inadequacies in the trial court's instructions as to elements of the crime of murder of the first degree and as to pertinent requirements of criminal culpability." Smith I, 513 A.2d at 1377. Nonetheless, where an allegedly faulty

22

jury charge implicates a habeas petitioner's federal constitutional rights, as we conclude in the next section this charge did, we have an independent duty to ascertain how a reasonable jury would have interpreted the instructions at issue. See Francis, 471 U.S. at 315-16, 105 S.Ct. at 1972; Sandstrom, 442 U.S. at 516-17, 99 S.Ct. at 2455; Kontakis, 19 F.3d at 116.

The dissent contends that the trial court's initial rendition of the meaning of "accomplice" pursuant to Pennsylvania law adequately conveyed to the jury that each subsequent use of the term was offense-specific. See Dissent slip op. at 42-43. The court instructed:

[A]n accomplice is a person if with the intent of promoting or facilitating the commission of a crime he solicits, commands, encourages or requests the other person or persons to commit that crime or crimes, or aids, agrees to aid, or attempts to aid the other person in the planning or committing the [sic] crime.

App. at 1029. Yet nothing in this charge would lead the jury to think that, when the court instructed the jury on murder, and the court used the word "accomplice," that word meant only "accomplice in the murder." Indeed, this charge reinforces the notion that an accomplice for one purpose is an accomplice for all purposes. There is at least a reasonable likelihood that, without further elaboration, the jurors understood the instruction as stating that if Smith harbored "the intent of promoting or facilitating the commission of a crime [robbery] [and] he solicit[ed], command[ed], encourage[d] or request[ed] [Alston] to commit that crime [robbery] or aid[ed], agree[d] to aid, or attempt[ed] to aid [Alston] in . . . planning or committing the crime [robbery]," then Smith is "an accomplice." Id. (emphasis added). The dissent seeks mightily to read into this charge the additional words that might have conveyed the correct impression -- "an accomplice in that crime" or "an accomplice for purposes of that crime." That critical impression, however, was not conveyed.

The Commonwealth urges that, taken as a whole, the charge informed the jury that it must find that Smith intended for the killing to occur in order to convict him of

23

first-degree murder. However, the Commonwealth has cited us no additional language from the charge concerning the elements of first-degree murder. Indeed, we have quoted above the entirety of the charge as pertinent to the first-degree murder count and, taken as a whole, we must conclude that there is at least a reasonable likelihood that the jury understood the charge as imposing upon the Commonwealth no burden of proving that Smith intended for the victim to die in order to convict Smith offirst-degree murder.

**C.**

Having determined that the jury instructions in this case were incorrect, we must further determine whether the error is of constitutional magnitude. " `[I]t is well established that a state court's misapplication of its own law does not <u>generally</u> raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.' " <u>Johnson v. Rosemeyer</u>, No. 96-1861, 1997 WL 318064, at *5 (3d Cir. June 13, 1997) (quoting <u>Geschwendt v. Ryan</u>, 967 F.2d 877, 888-89 (3d Cir. 1992) (en banc)) (alteration and emphasis added). However, this does not foreclose the possibility that, in the rare case, "a state court's misapplication of its own law" may itself result in a "wrong[ ] of constitutional dimension." In other words, a state court's misapplication of its own law, in and of itself, cannot be corrected by a federal court. However, when that misapplication has the effect of depriving a person of life, liberty, or property without due process of law in violation of the Fourteenth Amendment, the resulting federal constitutional error can be corrected by a federal habeas court. <u>See Gilmore v. Taylor</u>, 508 U.S. 333, 348-49, 113 S.Ct. 2112, 2121 (1993) (O'Connor, J., concurring in the judgment). On the other hand, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." <u>Johnson</u>, 1997 WL 318064 at *6. We conclude that the jury instruction at issue here was not merely an error of state law. By removing the Commonwealth's burden of proving beyond a reasonable

24

doubt one of the essential elements of the crime of first-degree murder, the instruction also contravened the Due Process Clause of the Fourteenth Amendment.

It is axiomatic that Pennsylvania may, within certain constitutional limits, define first-degree murder in whatever way the Commonwealth sees fit. See McMillan v. Pennsylvania, 477 U.S. 79, 85, 106 S.Ct. 2411, 2415-16 (1986); Johnson, 1997 WL 318064 at *6. It certainly may include within that definition felony-murder. Indeed, many states do include such killings in their definitions of first-degree murder. See Tison, 481 U.S. at 152-54 & nn.5-9, 107 S.Ct. at 1683-86 & nn.5-9. Pennsylvania itself defined first-degree murder in this way until 1974. See 18 PA. CONS. STAT. ANN. § 2502, Historical Note. The Supreme Court has held that the inclusion of felony-murder within the definition of first-degree murder, and the consequent imposition of the death penalty, does no violence to the federal Constitution so long as the defendant was a major participant in the felony and exhibited a reckless indifference to human life. See Tison, 481 U.S. at 158, 107 S.Ct. at 1688.

However, once the state has defined the elements of an offense, the federal Constitution imposes constraints upon the state's authority to convict a person of that offense. It is well-settled that "the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970); see also Victor, 511 U.S. at 5, 114 S.Ct. at 1242; Francis, 471 U.S. at 316-17, 105 S.Ct. at 1973-74; Sandstrom v. Montana, 442 U.S. 510, 520-22, 99 S.Ct. 2450, 2457-58 (1979). A jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of the offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights. See Carella v. California, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420 (1989) (per curiam); Rock, 959 F.2d at 1245-46; see also Polsky v. Patton, 890 F.2d 647, 651 (3d Cir. 1989) (no due process violation

25

where jury instruction "did not omit any essential element of the crime charged").

This result is not inconsistent with Johnson, 1997 WL 318064 at *6-8. In that case, the federal habeas petitioner contended that the jury instructions concerning justification rendered at his Pennsylvania trial for aggravated assault, and later affirmed by an intermediate appellate court, violated his rights pursuant to the Due Process Clause. See id. at *3-5. We noted that a conviction for aggravated assault in Pennsylvania required that the Commonwealth prove beyond a reasonable doubt that the defendant acted with malice. See id. at *6. We further noted that justification on the part of the defendant would necessarily negate a showing of malice. See id. Thus, the Commonwealth was required to prove that the defendant acted without justification. See id. The petitioner argued that, by misdescribing justification pursuant to Pennsylvania law, the trial court violated his Due Process rights. See id. He reasoned that the allegedly erroneous instruction allowed the Commonwealth to convict him of the offense without having proved every element, as properly defined, beyond a reasonable doubt. See id.

We rejected this argument, holding that no federal issue was raised. See id. at *8. We further held that a federal habeas court is bound by the definition given a state criminal offense even by intermediate state appellate courts. See id. at *10-13. However, in Johnson the Pennsylvania Supreme Court had not yet defined justification pursuant to state law. See id. at *4. The petitioner simply challenged the definition of that term rendered by the state trial and intermediate appellate courts, urging that the Pennsylvania Supreme Court would rule differently. Thus, Johnson stands for the unremarkable proposition that the states are free to define criminal offenses in any way they see fit, within certain constitutional limitations, even through their lower courts. This is so even if the definition they choose makes it somewhat easier to convict a person of the offense than would be the case under a different definition. Johnson most emphatically does not stand for the proposition that, once a state has defined a criminal offense, the state may

26

then proceed to convict a person of that offense on anything
less than proof beyond a reasonable doubt of all the
elements of the offense. Thus, whether a state is relieved of
that burden via an instruction that omits an element of an
offense, materially misdescribes that element, or shifts to
the defendant the burden of proof on that element, the
result is the same -- the defendant has been denied his
federal constitutional rights.

The dissent accuses us of holding that "the Due Process
Clause is violated whenever a state trial judge, in
instructing a jury on an element of a state offense, gives an
ambiguous instruction that prejudices the defendant."
Dissent slip op. at 45-46. We do no such thing. First,
rather than being "ambiguous," the language must be such
that "there is a reasonable likelihood that the jury has"
understood and applied it in a certain way. Supra at 18
(emphasis and internal quotation marks omitted). Second,
we require more than that the defendant simply be
"prejudice[d]." Our recent holding in Johnson, 1997 WL
318064 at *6-8, makes this clear. The standard requires
that the defendant be prejudiced in a very particular way --
it requires that the erroneous instructions have operated to
lift the burden of proof on an essential element of an
offense as defined by state law.

The dissent notes that the Supreme Court has never
expressly held that a jury charge that eases the state's
burden of proof on an element of an offense by omitting or
materially misdescribing it violates the Due Process Clause.
The proposition is true as far as it goes. If our duty as a
court of appeals were simply to sustain only those claims
the legal bases for which have already been settled by the
Supreme Court, the dissent's observation would have some
relevance. However, our duty also extends to predicting, in
circumstances where there is no specific guidance, how
that Court would decide if it were to consider the case
before us.

Contrary to the dissent's assertions, our holding follows
inexorably from the Supreme Court's decisions in
Sandstrom, Franklin, and Carella. As the dissent recognizes,
those cases "held that the Due Process Clause[i]s violated
where jury instructions in [a] criminal case[ ] set out either

27

a conclusive presumption or a mandatory rebuttable presumption that relieve[s] the prosecution of the burden of persuasion on the presumed fact." Dissent slip op. at 46. Here, the jury was not instructed on an essential element of first-degree murder -- Smith's intent. Instead, as we read the charge (and we understand the dissent disputes this point) the jury was instructed that as long as either Smith or Alston killed Sharp, and as long as Smith and Alston were accomplices in the robbery, Smith could be found guilty of first-degree murder. This charge was the functional equivalent of an instruction that as long as either Smith or Alston killed Sharp, and as long as Smith and Alston were accomplices in the robbery, the jury should conclusively presume that Smith had the intent to kill Sharp, and therefore he could be found guilty of first-degree murder. Yet the dissent apparently would find that the former charge does not violate Smith's constitutional rights, because it is not identical in form to the latter, which indisputably is repugnant to the Due Process Clause under Sandstrom, Franklin, and Carella.

In this case, there is no dispute that Pennsylvania law requires the Commonwealth prove specific intent to kill on the part of the defendant in order to convict him of first-degree murder. The Commonwealth unambiguously conceded as much at oral argument. However, the jury was instructed that Smith could be found guilty of first-degree murder even if it did not find beyond a reasonable doubt that Smith intended for a killing to take place. The instruction thus relieved the Commonwealth of the burden of proving beyond a reasonable doubt facts necessary to constitute every element of the offense with which Smith was charged. The instruction therefore constituted error pursuant to the Due Process Clause of the Fourteenth Amendment.

**D.**

Finally, we must determine whether the constitutional error that occurred in this case was harmless.

**1.**

We must first determine whether a jury charge that omits or misdescribes an element of an offense can _ever_ be harmless. We have explained that

28

[c]onstitutional errors have been categorized as one of two types: structural error or trial error. A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial. Trial error occurs during the presentation of the case to the jury, and may be qualitatively assessed in the context of all other evidence. Thus, trial errors are subject to a harmless error analysis.

Yohn v. Love, 76 F.3d 508, 522 (3d Cir. 1996) (citations omitted); see also Arizona v. Fulminante, 499 U.S. 279, 307-10, 111 S.Ct. 1246, 1264-65 (1991).5

In California v. Roy, ___ U.S. ___, ___, 117 S.Ct. 337, 339 (1996) (per curiam), the Supreme Court characterized "an error in the instruction that defined the crime" as a trial error rather than a structural error. In that case, the defendant was accused of aiding a confederate in committing first-degree murder. See id. at ___, 117 S.Ct. at 337. The trial court had instructed the jury the defendant could be convicted if it found beyond a reasonable doubt that he had knowledge of his cohort's unlawful purpose and that the defendant aided him in the commission of the act. See id. at ___, 117 S.Ct. at 337-38. The instruction was erroneous under state law because it failed to convey the critical idea that the defendant must also have intended to aid in the commission of the crime in order to be found guilty. See id. at ___, 117 S.Ct. at 338.

The Roy Court arguably did not decide that all "error[s] in the instruction that define[ ] the crime" constitute trial error, id. at ___, 117 U.S. at 339, but only that that label attaches "to errors that concern fairly narrow departures from proper charge language." Peck v. United States, 102 F.3d 1319, 1325 (2d Cir. 1996) (en banc) (per curiam)

---

5. In Kontakis v. Beyer, 19 F.3d 110, 116 (3d Cir. 1994), we stated broadly that "unconstitutional jury instructions" constitute trial error. There is at least one type of erroneous jury instruction, however, that constitutes structural error. See Sullivan v. Louisiana, 508 U.S. 275, 279-80, 113 S.Ct. 2078, 2082 (1993) (defective reasonable doubt charge). While most erroneous jury instructions that rise to the level of constitutional error will be trial error, we undertake to determine how to classify the specific type of instructional error that occurred here.

(Newman, C.J., concurring); see also id. at 1326 (Newman, C.J., concurring). It may be that a "mere" misstatement of an element of an offense is a trial error, while a complete omission of an element is a structural error. See Roy, ___ U.S. at ___, 117 S.Ct. at 339; see also Waldemer v. United States, 106 F.3d 729, 736 n.3 (7th Cir. 1997); United States v. Wiles, 102 F.3d 1043, 1059 (10th Cir. 1996) (en banc), modified, 106 F.3d 1516 (10th Cir.), petition for cert. filed, 65 U.S.L.W. 3632 (U.S. Mar. 10, 1997) (No. 96-1430); cf. Peck, 102 F.3d at 1325 (Newman, C.J., concurring).

However, we need not decide this issue. The charge error in the instant case is so similar to the one at issue in Roy that we believe that this case is controlled by that decision. In addition, several pre-Roy decisions from both the Supreme Court and this Court all hold that similar types of instructional error constitute trial error. See Yates v. Evatt, 500 U.S. 391, 402, 111 S.Ct. 1884, 1892 (1991) (instructions that impermissibly impose mandatory, rebuttable presumption on element of offense); Carella, 491 U.S. at 266, 109 S.Ct. at 2421 (mandatory, conclusive presumption); Rose v. Clark, 478 U.S. 570, 579-82, 106 S.Ct. 3101, 3106-08 (1986) (mandatory, rebuttable presumption); Pope v. Illinois, 481 U.S. 497, 501-03, 107 S.Ct. 1918, 1921-22 (1987) (instructions that misdescribe element of offense in violation of First and Fourteenth Amendments); United States v. Edmonds, 80 F.3d 810, 824 (3d Cir. 1996) (en banc) (instructions that effectively abridge federal criminal defendant's Sixth Amendment right to jury unanimity); Kontakis, 19 F.3d at 116 (instructions that alter burden of proof on element of offense). We conclude that the error that occurred here was trial error, not structural error.

2.

In a collateral proceeding, the standard for harmlessness is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." Roy, ___ U.S. at ___, 117 S.Ct. at 338 (internal quotation marks omitted); see also Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722 (1993); Yohn, 76 F.3d at 523; Alston v. Redman, 34 F.3d 1237, 1252 (3d Cir. 1994).

Pursuant to the Brecht standard,

[t]he crucial inquiry is the impact of the error on the minds of the jurors in the total setting. It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.

Yohn, 76 F.3d at 523 (citations omitted); see also Alston, 34 F.3d at 1252.

The Supreme Court has held that if a habeas court "is in grave doubt as to the harmlessness of an error," habeas relief must be granted. O'Neal v. McAninch, 513 U.S. 432, ___, 115 S.Ct. 992, 995 (1995). Thus, if the court concludes from the record that the error had a "substantial and injurious effect or influence" on the verdict, or if it is in "grave doubt" whether that is so, the error cannot be deemed harmless. See Roy, ___ U.S. at ___, 117 S.Ct. at 338.

**3.**

We now apply the harmless error analysis set forth above to the facts of this case. The Commonwealth urges that this error was harmless because the jury's findings, in light of the evidence, embrace the finding that Smith actually killed Sharp and intended to do so. According to the Commonwealth, the harmlessness of the error follows syllogistically: (1) the trial court essentially instructed the jury that Smith was guilty of first-degree murder if at least one of the robbers both killed Sharp and intended to kill him; (2) by finding Smith guilty of first-degree murder, the jury necessarily found beyond a reasonable doubt that either Smith or Alston killed Sharp and intended to do so; and (3) because there was evidence that Smith killed Sharp, and no evidence that Alston killed Sharp, the jury found beyond a reasonable doubt that Smith both killed Sharp and intended to do so.

While this reasoning has some superficial appeal, it does not withstand close scrutiny. The fundamental flaw arises

31

in the leap from step two to step three of the analysis. The jury was never asked to evaluate the respective probabilities that Smith or Alston killed Sharp. The verdict demonstrates that the jury found beyond a reasonable doubt that <u>one</u> of them killed Sharp. The evidence supporting this verdict demonstrates that it is <u>more likely</u> that Smith, rather than Alston, killed Sharp. However, this evidence and the factual findings it supports are not the " `functional[ ] equivalent' " of, nor do they "effectively embrace[ ]," a finding <u>beyond a reasonable doubt</u> that Smith killed Sharp. <u>Edmonds</u>, 80 F.3d at 824 (quoting <u>Carella</u>, 491 U.S. at 271, 109 S.Ct. 2423-24 (Scalia, J., concurring in the judgment)), <u>cert. denied</u>, ___ U.S. ___, 117 S.Ct. 295 (1996) (alteration added); <u>Roy</u>, ___ U.S. at ___, 117 S.Ct. at 339 (Scalia, J., concurring). We cannot say that a finding that either Smith or Alston killed Sharp is " `so closely related' " to a finding that Smith killed Sharp, in light of the evidence presented, that " `no rational jury' " that made the former finding would have failed to make the latter finding. <u>Edmonds</u>, 80 F.3d at 824 (quoting <u>Carella</u>, 491 U.S. at 271, 109 S.Ct. at 2423-24 (Scalia, J., concurring in the judgment)).

The strongest evidence that Smith actually killed Sharp were his admissions, made immediately after the robbery, related at trial by Barrow and Yancey. These two witnesses were admitted accomplices to the robbery whose credibility was therefore in question. Smith's participation in the robbery was well established by independent evidence -- the jury did not need to believe either Barrow or Yancey in order to find him guilty of robbery and therefore (because of the erroneous jury instructions) first-degree murder. It is thus unclear whether and to what extent the jury believed or disbelieved Barrow and Yancey. Since the jury charge did not necessitate that the jury make this determination, we can only speculate as to its conclusion with regard to Barrow and Yancey's credibility. We cannot assume that the jury, having found Smith guilty, "believed all properly admitted evidence against him and disbelieved all evidence in his favor." ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 28 (1970).

The situation here is analogous to the one contemplated in <u>Yates</u>, 500 U.S. at 405-06, 111 S.Ct. at 1894. In that

32

"mandatory rebuttable presumption" case, the Supreme
Court cautioned that if it appears that the jury did not
consider

all the evidence bearing on the issue in question[,]
before it made the findings on which the verdict rested
. . . an examination of the entire record would not
permit any sound conclusion to be drawn about the
significance of the error to the jury in reaching the
verdict. . . . [T]he terms of some presumptions so
narrow the jury's focus as to leave it questionable that
a reasonable juror would look to anything but the
evidence establishing the predicate fact in order to infer
the fact presumed.

Id. (footnote omitted). Analogously, the effect of the
instructions here was to "so narrow the jury's focus as to
leave it questionable that a reasonable juror would"
endeavor to answer the rather difficult question whether
Smith killed Sharp, rather than to rest upon the answers to
the relatively straightforward questions whether Smith
participated in the robbery and whether either Smith or
Alston killed Sharp.

Moreover, the Commonwealth proceeded on the theory
that Smith was guilty of first-degree murder whether or not
he intended the victim to be killed. Although the prosecutor
in summation contended that Smith committed the killing,
he also repeatedly admonished the jury that it need not
consider whether Smith actually killed Sharp. See Cross
App. at 1007-08, 1010, 1012-13, 1014, 1017. Having
repeatedly urged the jury to base its verdict on a theory
predicated on a fundamental constitutional error, the
Commonwealth cannot now seriously contend that that
error had no "substantial and injurious effect or influence"
on the verdict. See Yohn, 76 F.3d at 523-24 (repeated
emphasis by prosecution on importance of erroneously
admitted evidence demonstrated error was not harmless).

For these reasons, our harmless-error analysis leads
inexorably to the conclusion that the error here was not
harmless. Upon a review of the record, we cannot say that
the error had no "substantial and injurious effect or
influence" on the jury's verdict.

33

**IV.**

The judgment of the district court will be reversed to the extent that it denied Smith habeas relief with regard to his conviction for first-degree murder. The judgment will be vacated in all other respects. The matter will be remanded to the district court with directions that it conditionally order Smith released from confinement. Smith shall be released unless the Commonwealth retries him for the crime of first-degree murder within 180 days.6

---

6. We express no opinion whether, following the grant of habeas relief, the Commonwealth may properly move to resentence Smith for any lesser included homicide (such as murder or manslaughter where specific intent is not an element of the crime). Nor do we express an opinion concerning the propriety of the Commonwealth moving to resentence Smith on the other crimes for which he was convicted along with first-degree murder.

34

ALITO, <u>Circuit Judge</u>, dissenting.

The majority's decision in this case is troubling. In 1983, Clifford Smith was convicted in state court forfirst-degree murder. At his trial, the prosecution introduced strong evidence that Smith and another man, Roland Alston, robbed a pharmacy and that, after the pharmacist was ordered to lie face down on the floor, Smith proceeded to execute him with a gunshot to the head. Fourteen years later, when retrial will almost certainly be difficult at best, the majority holds that Smith's federal habeas petition must be granted based on a perceived ambiguity in the jury instructions. According to the majority, certain references to the concept of an "accomplice" are ambiguous in that they could be interpreted to mean either " `accomplice in the killing,' `accomplice in the robbery,' or both." Maj. Op. at 20-21. This supposed ambiguity, the majority concludes, not only created confusion about the requirements of state law but rose to the level of a federal due process violation.

e majority takes this course even though (1) the trial judge, before making the references to "accomplice" that the majority finds to be ambiguous, provided an accurate and detailed definition of that term which, if read into all of the challenged references, renders them accurate; (2) Smith's attorney did not object at trial to the relevant portions of the jury charge; and (3) Smith never argued in either of his two appeals to the Pennsylvania Supreme Court that these portions of the jury instructions violated either state law or the Due Process Clause. Under these circumstances, I cannot agree with the majority's decision.

I.

An important threshold question is whether Smith exhausted state remedies. Although the Commonwealth has not raised this issue, I believe that we should nevertheless address it under the circumstances present here.1 In

_____

1. In this opinion, I rely on the caselaw regarding exhaustion and procedural default as they existed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132,

Granberry v. Greer, 481 U.S. 129, 134-35 (1987), the Supreme Court stated that "both comity and judicial efficiency" might make it appropriate for a court to raise the issue of exhaustion on its own where a case "presents an issue on which an unresolved question of fact or of state law might have an important bearing." 481 U.S. at 134-35. The present case falls squarely within this description. As noted, the majority's decision is founded upon its conclusion that the jury instructions inaccurately explained Pennsylvania's rule of accomplice liability. Before considering whether this purported misstatement of state law rose to the level of a federal due process violation, it would be helpful to have the benefit of a decision by the Pennsylvania courts on the underlying issue of state law.

We have no such decision, however, because Smith did not challenge the relevant portions of the jury instructions on any ground in either of his two appeals to the Pennsylvania Supreme Court. Not only did he fail to raise the federal due process claim on which the majority's decision rests, but he did not even contend that the instructions misstated state law.2

_____

110 Stat. 1221, which became law on April 24, 1996, after Smith's federal habeas petition was filed. Under a provision of that Act applicable to a state prisoner under a capital sentence, a district court is generally precluded from considering a claim unless it was "raised and decided on the merits in the State courts." 28 U.S.C. § 2264(a). This provision applies to federal habeas petitions already pending when the Act became law. See Lindh v. Murphy, 1997 WL 338568 (U.S. Sup. Ct. June 23, 1997). However, this provision applies only if a state satisfies certain conditions, see U.S.C. § 2261, and in Death Row Prisoners of Pennsylvania v. Ridge, 106 F.3d 35, 36 (3d Cir. 1997), the Commonwealth declared, and our court agreed, that Pennsylvania did not meet the requirements of § 2261 as of January 31, 1997. It therefore appears that § 2264(a) is inapplicable here. Under the current version of 28 U.S.C. § 2254(b)(3), consideration of the issue of exhaustion would be required. However, Smith's petition was filed before this provision took effect. See Lindh, supra.

2. On direct appeal, Smith argued that the trial judge erred in refusing to give three instructions requested by the defense, namely, Nos. 8, 11, and 12. Number 8 defined first degree murder; number 11 defined

36

Although Smith did not exhaust state remedies, "[a] petitioner's failure to exhaust state remedies is . . . excused . . . when state law `clearly foreclose[s] state court review of [the] unexhausted claims.' " Doctor v. Walters, 96 F.3d 675, 680 (3d Cir. 1996) (quoting Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993)). Here, the Pennsylvania courts might well hold that review of Smith's claim is foreclosed under the Post Conviction Relief Act, 42 Pa. Cons. Stat. Ann. S. §§ 9541–46 (Supp. 1996). In Doctor, 96 F.3d at 681, we explained that under Pennsylvania law

"[a]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction

_____

involuntary manslaughter; and number 12 defined the terms "intentionally," "knowingly," "recklessly," and "negligently." None of these requested instructions related to the claim on which the majority relies.

The Supreme Court of Pennsylvania rejected Smith's argument regarding the requested instructions on involuntary manslaughter on the ground that the evidence at trial did not support such a charge. Commonwealth v. Smith, 513 A.2d 1371, 1377–78 (Pa. 1986). The court rejected Smith's argument concerning the other two requested instructions on the ground that the substance of those requests was adequately covered by the trial judge. The state supreme court wrote:

It is established that a trial court is not required to accept points submitted by counsel verbatim, but rather is free to select its own forms of expression. Commonwealth v. McComb, 462 Pa. 504, 509, 341 A.2d 496, 498 (1975). "The only issue is whether the area is adequately, accurately and clearly presented to the jury for their consideration." Id. We have reviewed the record in the present case and find no inadequacies in the trial court's instructions as to elements of the crime of murder of the first degree and as to pertinent requirements of criminal culpability.

513 A.2d at 1377.

This passage cannot reasonably be interpreted to mean that the state supreme court sua sponte considered the federal due process claim now before us. Indeed, it would be utterly unrealistic to interpret the court's statements to mean even that it had rejected all possible objections to the instructions that might be raised under state law. To go further and read that statement as a rejection of an unraised federal due process claim would be absurd.

37

proceeding." [42 Pa. Cons. Stat. Ann.] § 9544(b). As the Pennsylvania courts have noted, "nearly all claims are waived under the PCRA since nearly all claims potentially could have been raised on direct appeal . . . . <u>Commonwealth v. Eaddy</u>, 419 Pa. Super. 48, 614 A.2d 1203, 1207-08 (1992), appeal denied, 534 Pa. 636, 626 A.2d 1155 (1993); <u>accord Commonwealth v. Stark</u>, 442 Pa. Super. 127, 658 A.2d 816, 820 (1995).

We recognized, however, that PCRA review might not be foreclosed if a petitioner is "able to demonstrate a `miscarriage of justice' warranting `departure from the PCRA's stringent eligibility requirements.' " <u>Doctor</u>, 96 F.3d at 681 (quoting <u>Commonwealth v. Fiore</u>, 445 Pa. Super. 401, 665 A.2d l185, 1193 (1995) (Hoffman, J., concurring) (citations omitted), appeal denied, 675 A.2d 1243 (1996)). I question whether at this time the Pennsylvania courts would entertain Smith's challenge to the jury instructions, but I would certainly request briefing from the parties on this question.

If, as seems likely, PCRA review is foreclosed because of Smith's failure to raise his federal due process claim in the prior state-court proceedings, we should consider the doctrine of procedural default. <u>See Coleman v. Thompson</u>, 501 U.S. 722, 735 n.* (1991). This doctrine, like exhaustion, has not been raised by the Commonwealth, but I believe that we should apply this doctrine nevertheless. Our court, <u>see Hull v. Freeman</u>, 932 F.2d 159, 164 n.4 (3d Cir. 1991), and many others have held that procedural default may be raised <u>sua sponte</u> by a court of appeals. <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Dubois</u>, 19 F.3d 708, 714 (1st Cir. 1994); <u>Washington v. James</u>, 996 F.2d 1442 (2d Cir. 1993); <u>Hardiman v. Reynolds</u>, 971 F.2d 500, 502-04 & n.4 (10th Cir. 1992).3 In <u>Washington </u>, the Second Circuit explained

_____

3. <u>Cf. Caspari v. Bohlen</u>, 510 U.S. 383, 389 (1994) (non-jurisdictional <u>Teague</u> rule may but need not be raised by federal court <u>sua sponte</u>; <u>Granberry</u>, 481 U.S. at 134-35 (same for exhaustion); <u>Patsy v. Board of Regents of Fla.</u>, 457 U.S. 498, 515 n.19 (1982) (same for Eleventh Amendment defense). <u>Compare Trest v. Cain</u>, 94 F.3d 1005 (5th Cir. 1996), petition for cert. granted, 117 S.Ct. 1842 (1997) (presenting question whether court of appeals is required to raise procedural

that "[p]rinciples of comity and federalism bear on the relations between court systems, and those relations will be affected whether or not the litigants have raised the issue themselves." 996 F.2d at 1448. In Hardiman, the Tenth Circuit, quoting our opinion in Brown v. Fauver, 819 F.2d 395, 398 (3d Cir. 1987) (holding that a court could raise exhaustion sua sponte), stated that it was appropriate for a court to raise the issue of procedural default because it implicates " `values that may transcend the concerns of the parties to [the] action.' " 971 F.2d at 502.

In Ortiz, the First Circuit, when confronted with a federal constitutional claim closely resembling Smith's, held that it was appropriate to raise the issue of procedural default on its own motion. The petitioner in Ortiz, argued that "his right to due process was violated because the jury was not properly instructed on the elements of felony-murder under Massachusetts law, and therefore did not find every element of the offense beyond a reasonable doubt." 19 F.3d at 710. Although the petitioner argued on direct appeal that the instructions were deficient, the Supreme Judicial Court of Massachusetts declined to review his claim on the merits because he had not objected to the instructions at trial. Id. at 713. Instead, the Supreme Judicial Court "limited its inquiry to whether the error gave rise to a substantial likelihood of miscarriage of justice." Id. at 714. Accordingly, the First Circuit found that "the state procedural default

_____

default). The petition in Trest argues that, under Gray v. Netherland, 116 S.Ct. 2080, 2082 (1996), procedural default is an affirmative defense that is lost if not properly raised by the state. But while it is certainly true that a state may lose the "right" to have the doctrine of procedural default considered if it does not properly raise that issue, see Gray, 116 S.Ct. at 2082, it is far from clear that Gray meant to go further and say that the lower federal courts lack the discretion to raise the issue on their own. See id. (citing Schiro v. Farley, 510 U.S. 222, 227-28 (1994) (refusing as a matter of discretion to consider Teague bar where not raised at cert. petition stage), and Jenkins v. Anderson, 447 U.S. 231, 234 n.1 (1980) (refusing to consider procedural default where raised for the first time in Supreme Court).

39

[was] clear on the face of the record," and thus found it unnecessary to review the merits of the petitioner's claim.[4]

Like the First Circuit in Ortiz, I think that it is appropriate for us to raise the issue of procedural default in this case on our own motion, particularly since Smith's federal constitutional claim is grounded on an issue of state law. Since Smith has not had an opportunity to address the issue of procedural default, I would request further briefing on that issue before determining whether there is any basis for excusing default in this case.

The majority refuses to consider the issues of exhaustion and procedural default -- indeed, refuses even to request briefing on these serious issues. The majority voices concern that consideration of these issues would "result in undue delay." Maj. Op. 13; see also id. at 12. This concern is curious -- and not only because of the pace of the post-conviction proceedings to date. Consideration of procedural default would not simply delay a decision on the merits of Smith's claim; rather, it holds the potential for precluding a decision on the merits of that claim. If the claim is procedurally defaulted, if Smith cannot show cause and prejudice, and if no other exception applies (questions on which I express no view without hearing from the parties), then neither the state nor the federal courts would decide the merits of Smith's claim. Obviously, then, the refusal to consider procedural default cannot be defended on the ground that to do so would only delay an inevitable decision on the merits.

The majority also contends that the jury instructions resulted in a "miscarriage of justice." As I show below, however, the instructions at issue here were at most ambiguous -- and that is undoubtedly why they did not even elicit an objection from Smith's trial counsel, why challenges to these instructions were not included among the numerous arguments raised in Smith's two appeals to the Supreme Court of Pennsylvania, and why the district court judge in this federal habeas corpus proceeding thought that the alleged errors that the majority is willing

_____

4. The First Circuit did state that it would have rejected the claim even if it had reached the merits.

to label "a miscarriage of justice" were meritless and did not even warrant discussion. See Smith v. Horn, 1996 WL 172047 (E.D. Pa. 1996), page 12.

There is one reasonable argument that can be made in support of the conclusion that we should not raise the doctrines of exhaustion and procedural default on our own, i.e., that these doctrines, which serve to protect state prerogatives, should be raised by the state's attorneys. But, as I previously noted, our court and others have recognized that the values served by these doctrines "may transcend the concerns of the parties to an action." Brown v. Fauver, 819 F.2d at 398.

Aiming to curb federal habeas corpus abuses, particularly in death penalty cases, Congress endorsed this view when it enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–132, 110 Stat. 1221. In capital cases subject to chapter 154, 28 U.S.C. §§ 2261–66, Congress prohibited federal courts from considering a claim unless it was "raised and decided on the merits in the State courts." 28 U.S.C. § 2264(a). In other cases, Congress provided that a state may not be deemed to have waived exhaustion unless it does so expressly. 28 U.S.C. § 2254(b)(3). These new provisions do not apply here (see footnote 1, supra), but they are animated by the same respect for the state court systems that informed our court's prior decisions. Accordingly, I believe that we should not proceed to review the merits of Smith's due process claim without considering the issues of exhaustion and procedural default. However, since the majority has skipped over these questions and plunged into the merits of Smith's federal constitutional claim, I will address the merits of that claim as well.

II.

A. The Pennsylvania rule of accomplice liability is as follows:

When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense if he acts with the kind of culpability, if any,

41

with respect to that result that it is sufficient for the commission of the offense.

18 Pa. Cons. Stat. Ann. § 306(d) (emphasis added). An "accomplice" is defined in pertinent part as follows:

A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it.

18 Pa. Cons. Stat. Ann. § 306(c) (emphasis added). Thus, in order for an "accomplice" to be criminally responsible for a particular offense, the "accomplice" must have "the intent of promoting or facilitating the offense" -- which means that the accomplice must at a minimum possess the intent necessary for conviction of that offense as a principal.

In this case, Smith was charged with first degree murder, robbery, possession of instruments of crime, and conspiracy. The trial judge instructed the jury on the elements of all of these offenses, as well as the lesser included homicide offenses of second and third degree murder and voluntary manslaughter.

Before setting out the elements of these offenses, however, the trial judge instructed the jury on the principles of accomplice liability, which were relevant, not only to the first degree murder charge, but to all of the other substantive offenses as well. The trial judge accurately stated that an accomplice is criminally responsible for the acts of the principal. CA 1028. "Therefore," the court stated, "it is necessary that you understand and that we spell out what is meant under our Crimes Code by the term accomplice." See CA 1028-29. Tracking the language of 18 Pa. Cons. Stat. Ann. § 306(c)(1), the trial judge then explained that a person is an accomplice "if with the intent of promoting or facilitating the commission of a crime he solicits, commands, encourages or requests the other person or persons to

42

commit _that crime or crimes_, or aids, agrees to aid, or
attempts to aid the other person in the planning or
committing _the crime_." _Id._ (emphasis added). Under this
instruction, as under 18 Pa. Cons. Stat. Ann. § 306(c), a
person can be an accomplice with respect to the
commission of a particular crime only if that person has
"the intent of promoting or facilitating" the commission of
"that crime."

When a trial judge, in instructing a jury, provides a
definition of a complicated legal term, the judge is not
generally required to repeat that definition every time the
term is subsequently employed. Rather, the judge may
reasonably rely on the prior definition, and that is what the
trial judge did here -- without objection. If the previously
provided definition is read into the instructions whenever
the judge referred to an "accomplice," the judge's
instructions are correct. Under this procedure, every
reference to "an accomplice" should be read as a reference
to an "accomplice" with respect to the particular offense or
offenses that the judge is discussing. In finding that certain
references to the concept of an "accomplice" are ambiguous,
the majority ignores the significance of the definition that
preceded these references.

For example, the majority holds (Maj. Op. 18-19) that the
trial judge violated due process when he gave the following
instruction:

[T]he elements of first degree murder are the unlawful
killing of another person done intentionally; that is,
willfully, deliberately and with premeditation, plus
malice, as I will define that term to you. If these
elements are established beyond a reasonable doubt,
you may, on the theory that one was the perpetrator
and the other the accomplice, find Clifford Smith guilty
of murder in the first degree . . . .

CA 1035. The majority finds this instruction objectionable
because it did not clearly convey the message that, if Alston
pulled the trigger, Smith could be convicted of first degree
murder only if Smith was Alston's " `accomplice in the
killing' and not simply [his] accomplice in the robbery.' "
Maj. Op. 19. But if the previously supplied definition of an

43

"accomplice" is applied, this alleged ambiguity is dispelled. As noted, an "accomplice" must have the intent required for the offense in question (see Pa. Cons. Stat. Ann. § 306(c); CA 1029); therefore, to be an accomplice in a first degree murder a person must have the intent required for that offense, i.e., the person must act intentionally, willfully, deliberately, and with premeditation. 18 Pa. Cons. Stat. Ann. §§ 2502(a), (d).

To be sure, if Smith's trial attorney had objected to this and the other instructions at issue on the ground that they were suspectable to the misinterpretation that troubles the majority, if the trial judge had overruled this objection, if the objection had been raised on direct appeal, and if we sat on a Pennsylvania appellate court, rather than a federal court, I could understand a decision requiring a new trial. But for a federal appeals court to order a new trial 14 years later based on such a previously unchallenged ambiguity is shocking.

The remaining portions of the instructions that the majority has singled out are similar. The majority objects (Maj. Op. 19-20) to certain instructions in which the trial judge attempted to explain in generic terms the application of the principles of accomplice liability to any of the homicide offenses that were before the jury, i.e.,first, second, and third degree murder and voluntary manslaughter. See CA 1030-32. Probably because he was speaking about all of these offenses at the same time, the judge did not at this point specify the intent required for conviction for each offense (he did that a few pages later), but if the definition of an accomplice that he gave on the previous page is applied, the challenged instructions were correct. In retrospect, one might argue that it was inadvisable for the trial judge to have attempted to explain in one breath how the principles of accomplice liability relate to all four of the homicide offenses that were before the jury, and one might fault the particular language that the judge chose. But I see nothing in these instructions that justifies federal habeas relief.5

_____

5. The majority goes so far as to cite alleged ambiguities in the instructions on criminal conspiracy as support for its decision to strike

44

Having identified what is at most an ambiguity in the jury instructions on a point of state law, the majority alchemizes this ambiguity into a violation of the Due Process Clause. The majority writes:

In this case, the misapplication of state law resulted in a federal constitutional error. It is well-settled that "the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970); see also Victor, [v. Nebraska, 511 U.S. 1, -- (1994), 511 U.S. 114 S.Ct. -- 1242 (19 ); Francis, 471 U.S. at 317, 105 S.Ct. at 1973; Sandstrom v. Montana, 442 U.S. 510, 521, 99 S.Ct. 2450, 2458 (1979). A jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of the offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights. See Carella v. California, 491 U.S. 263, 265, 109 S.Ct. 2419, 2420 (1989) (per curiam); Rock, 959 F.2d at 1245-46; see also Polsky v. Patton, 890 F.2d 647, 651 (3d Cir. 1989) (no due process violation where jury instruction "did not omit any essential element of the crime charged").

Maj. Op. at 25.

In essence, the majority holds that the Due Process Clause is violated whenever a state judge, in instructing a jury on an element of a state offense, gives an ambiguous

_____

down Smith's first degree murder conviction. See Maj. Op. 18-19; CA 1047-48. This argument is far-fetched indeed. By this point in the instructions, the trial judge had turned to the last "remaining crimes in the Information, . . . the crimes of criminal conspiracy to commit the various robberies . . . criminal conspiracy to commit first degree murder and murder and criminal conspiracy to commit the act of possession of instruments of crime." CA. 1043. If there were any serious flaws in these instructions -- and I see none -- they could at most undermine Smith's conspiracy conviction, not his conviction for first degree murder.

45

instruction that prejudices the defendant -- even if defense counsel does not object. None of the decisions cited by the majority supports this holding. In Winship, the Supreme Court held that the Due Process Clause requires proof beyond a reasonable doubt to support a finding that a juvenile committed an act that would constitute a crime if committed by an adult. Sandstrom, Francis, and Carella all held that the Due Process Clause was violated where jury instructions in criminal cases set out either a conclusive presumption or a mandatory rebuttable presumption that relieved the prosecution of the burden of persuasion on the presumed fact. Victor reviewed instructions that defined the concept of reasonable doubt. No Supreme Court case cited by the majority -- or any other Supreme Court decision of which I am aware -- has held that the Due Process Clause is violated whenever a state trial judge, in instructing a jury on the elements of a state offense, uses ambiguous language that prejudices the defendant. Nor is the majority's decision supported by either of the Third Circuit cases it cites. In Rock, 959 F.2d at 1245-46, we merely restated in dicta the holdings of Winship and Sandstrom. In Polsky, we held that a particular instruction conveyed the essence of the element that was allegedly omitted. 890 F.2d at 651.

Although not cited by the majority, the Supreme Court opinion that appears to be most closely on point, Henderson v. Kibbe, 431 U.S. 145 (1977), cuts against the majority's argument. In Henderson, a federal court of appeals, relying on Winship, ordered that federal habeas corpus relief be granted because the trial judge (without objection) failed to instruct the jury on an essential element of the offense of second-degree murder. Reversing, the Supreme Court wrote:

 Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

46

The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," Capp v. Naughten, 414 U.S. at 147, not merely whether "the instruction is undesirable, erroneous, or even `universally condemned,' " id. at 146.

431 U.S. at 154 (footnotes omitted).

Here, the instructions cited by the majority did not " `so infect[ ] the entire trial that the resulting conviction violates due process.' " Id. (citation omitted). Thus, I would reject Smith's due process claim.

It is a cardinal principle that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 112 S.Ct. 475, 480 (1991). Our court has emphasized this important rule. Geschwendt v. Ryan, 967 F.2d 877, 888–89 (3d Cir. 1992) (en banc); Zettlemoyer v. Fulcomer, 923 F.2d 284, 309 (3rd Cir. 1991). Cf. Johnson v. Rosemeyer, 1997 WL 318064, (3d Cir. June 13, 1997). The majority's extension of Winship and related precedents threatens to undermine this important principle and to claim for a federal habeas court the power to decide, long after a state trial has been completed, whether previously unchallenged jury instructions set out the requirements of state law with sufficient clarity to satisfy the federal court's taste. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984). The majority's decision here not only works an injustice in an important case but it creates a dangerous precedent. I must therefore dissent.

47

A True Copy:
Teste:

<u>Clerk of the United States Court of Appeals</u>
<u>for the Third Circuit</u>

48