**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
————————

No. 21-3075
————————

SHELDON HANNIBAL,
Appellant

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF CORRECTIONS;
SUPERINTENDENT GREENE SCI; SUPERINTENDENT ROCKVIEW SCI;
DISTRICT ATTORNEY PHILADELPHIA
————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2-13-cv-00619)
District Judge:  Honorable Gerald A. McHugh
————————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 17, 2023
————————

Before:  CHAGARES, *Chief Judge*, PHIPPS, and CHUNG, *Circuit Judges*.

(Filed: January 17, 2024)
(Amended: April 2, 2024)
————————

OPINION[*]
————————


PHIPPS, *Circuit Judge*.

In this appeal, a Pennsylvania inmate serving a life sentence for first-degree murder

and conspiracy to commit murder challenges the denial of his petition for a writ of habeas

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

corpus on four grounds. He claims that he was denied *Brady* materials, had evidence of another crime introduced against him in violation of due process, and was convicted based on erroneous jury instructions. He also argues that those errors, even if not independently prejudicial, were in aggregate enough to deny him a fair trial. For the reasons below, we will affirm the District Court's denial of habeas relief.

## I.   FACTUAL BACKGROUND

At about 1:30 in the morning on October 25, 1992, Peter LaCourt and his friend, Barbara Halley, were walking up an interior stairwell in the Cambridge Mall public housing high-rise in North Philadelphia. LaCourt encountered Sheldon Hannibal and a fifteen-year-old girl, Tanesha Robinson, who were sitting on the steps between the second and third floors having a conversation. LaCourt offered to sell Hannibal a gold chain. Hannibal asked to see the chain, and LaCourt handed it to him. But after examining the chain, Hannibal concluded that it was fake and began punching LaCourt.

Both LaCourt and Halley tried to get away. Halley was successful: she ran down the stairs to the guard booth in search of help. LaCourt was not. As he started to run away down the hallway of the building, Hannibal pulled out a gun and threatened to kill him, so he quit running. Hannibal then approached LaCourt and began hitting him with the gun.

During this conflict, Larry Gregory emerged from one of the apartments on the floor with his own gun. He joined Hannibal in beating LaCourt. LaCourt pleaded for his life – offering the chain and all his money.

Those offers were not enough. Robinson, who had observed the events from near the stairwell, at that point turned to run upstairs to her cousin's sixth-floor apartment. As she was doing so, she "heard a lot of gunshots." Trial Tr. at 90:15–16 (Mar. 4, 1994) (A-1234). And once she reached her cousin's apartment, she looked out the window to see

2

Hannibal and Gregory fleeing in a gray car. From the guard station, Halley heard the gunshots, and she returned to find that LaCourt had been shot.

LaCourt died from the gunshot wounds, and the Commonwealth charged Hannibal and Gregory with first-degree murder and conspiracy to commit murder. Hannibal was held in pretrial detention and Gregory was released on bond. At two preliminary hearings in the Common Pleas Court of Philadelphia County, Robinson provided her account of the events surrounding LaCourt's death.

By the time of the joint trial for both Hannibal and Gregory, however, Robinson had been killed. Her preliminary hearing testimony was read into the record at trial. Other law enforcement witnesses corroborated portions of her testimony by testifying about recovering pieces of a gold chain in the stairwell and finding LaCourt's dead body on the stairway with a total of six gunshot wounds, including wounds to his head and back. Also, Halley testified to what she had seen and heard. But no one testified to seeing Hannibal actually shoot LaCourt.

The Commonwealth, however, had more to its case. It also had Hannibal's alleged jailhouse confession. According to the testimony of an inmate, James Buigi, during Hannibal's pretrial detention between late October and November 1993, he and Hannibal shared Cell 50 at the Philadelphia Industrial Corrections Center, referred to as the 'PICC.' Buigi testified that after a few days, Hannibal was "comfortable" enough with Buigi to ask him if he knew anything about the law. Trial Tr. at 22:19 (Mar. 1, 1994) (A-896). Buigi responded, "somewhat," Trial Tr. at 107:15 (Feb. 28, 1994) (A-854), and then Hannibal asked if he could be convicted of first-degree murder without a witness, since "his witness was one of the girls that got killed in the Cambridge Mall." Trial Tr. at 107:21–22 (Feb. 28, 1994) (A-854). Hannibal told Buigi that Robinson "ain't see me when I shot [LaCourt],

3

all she seen was when I pistol-whipped him." Trial Tr. at 113:9–11 (Feb. 28, 1994) (A-860). Still, Hannibal considered Robinson to be "the only witness that can hurt [him] in the trial," Trial Tr. at 122:8–9 (Feb. 28, 1994) (A-869), so "he told one of his friends that he needed [her] out of the way," and he heard later that it was taken care of. Trial Tr. at 122:6–8 (Feb. 28, 1994) (A-869). In sharing that information with Buigi, Hannibal did not know that Buigi and LaCourt had been friends. And the day after that conversation, Buigi reported Hannibal's statements to law enforcement.

In partial corroboration of Buigi's testimony, the Commonwealth called two corrections officers as witnesses. One testified that he was "positive" that Hannibal and Buigi shared Cell 50 at the PICC, for a few weeks starting in late October or early November of 1993. Trial Tr. at 22:5 (Mar. 8, 1994) (A-1420). Another officer gave a similar account, testifying that he remembered Hannibal and Buigi sharing Cell 50 in late October and early November because Hannibal "was annoying." Trial Tr. at 32:18 (Mar. 8, 1994) (A-1430).

Also, in corroboration of Hannibal's alleged confession that he had a friend who "took care of" Robinson, Trial Tr. at 122:21 (Feb. 28, 1994) (A-869), the Commonwealth called two additional witnesses. One of them, twenty-one-year-old Terrence Richardson, who resided in Cambridge Mall in 1992 and 1993, testified that he asked Hannibal's co-defendant, Gregory, about his case, and Gregory responded, in reference to Robinson, "[t]hat snitch ass bitch got to die." Trial Tr. at 76:25–77:1 (Mar. 3, 1994) (A-1133–34).[1] Richardson further relayed that he was in Gregory's apartment on August 3, 1993, the day before Robinson's death, with a few other men as they planned to kill her. The second

---

[1] Hannibal argues that Richardson recanted during post-trial motions in Gregory's case, but the Pennsylvania Supreme Court determined that the recantation was unreliable. *Commonwealth v. Hannibal*, 156 A.3d 197, 222 (Pa. 2016).

witness was the detective who found Robinson's body on August 4, in her cousin's sixth-floor apartment under some clothing with a close-range gunshot wound through her head. The detective also testified that he found the bodies of two other young women who happened to be with Robinson in the apartment: twenty-year-old Jean Robinson, who was found in a bedroom with the back of her head blown off, and seventeen-year-old Latoya Cook, who was found on a sofa with a gunshot wound to the head. Two feet from Cook's body was her six-month-old baby, who was crying but otherwise uninjured.

In allowing the admission of this evidence over Hannibal's objection, the trial court issued limiting instructions to the jury. At the outset of the jury charge, the trial court acknowledged the evidence connecting Hannibal with the deaths of the three girls but stated that that evidence was for the "limited purpose . . . of tending to show a consciousness of guilt." Trial Tr. at 127:14–15 (Mar. 9, 1994) (A-1585). The trial court admonished the jury that it "must not regard this evidence as showing that these defendants are persons of bad character or criminal tendencies from which [it] might be inclined to infer guilt in this case." Trial Tr. at 127:17–20 (Mar. 9, 1994) (A-1585). And it reiterated that the jury must not "consider the evidence concerning the witness' killing as evidence that the defendants killed the victim in this case. The only thing it is for is to be used as a possible consciousness of guilt." Trial Tr. at 128:18–22 (Mar. 9, 1994) (A-1586).

After the Commonwealth rested, Hannibal testified. He denied having an altercation with LaCourt, taking LaCourt's chain, possessing a gun, and shooting LaCourt. He also disputed that Buigi was his cellmate. Instead, although he recounted that he was in Cell 50 from the end of October through November 1993, he testified that his cellmate was a "Puerto Rican guy named June." Trial Tr. at 32:17 (Mar. 7, 1994) (A-1314).

At the time of trial, Hannibal did not know that the prosecutor had access to additional prison-housing information. Records from the PICC reported that in October and November of 1993, multiple prisoners – including Buigi (under an alias), but not Hannibal – occupied Cell 50. Those same records indicated that during that time, multiple occupants were assigned to the same bed, while the other bed went unassigned.

Later, while the case was pending on appeal, the prosecutor obtained more prison housing information. In response to the prosecutor's letter asking if Hannibal and Buigi had shared a cell in October and November of 1993, the Director of Classification, Movement, and Registration for the Philadelphia Prison System responded that the two men were in the same cellblock at a different institution (not the PICC) between August and mid-October 1993.

At the close of trial, the judge instructed the jury about the charges for conspiracy to commit murder and for first-degree murder. For conspiracy, the judge explained the requirement that a defendant have the specific intent to commit a crime:

> [T]o find a defendant guilty of conspiracy to commit a crime, you must be satisfied initially that the following two elements of conspiracy have been proven beyond a reasonable doubt: First, that a defendant has agreed with another person or persons that they or one of them would engage in conduct which constitutes the crime in this case, or that they have agreed to aid another person in the planning or commission of the crime. Second, that the defendant, a defendant, his co-conspirator or accomplice did so *with the intent of promoting or facilitating commission of the crime*.
>
> * * *
>
> You may find a defendant guilty of a crime as a conspirator if you are satisfied beyond a reasonable doubt first that the defendant agreed with the others to commit the crime . . . and *that the defendant agreed with the intent* of promoting or facilitating [its] commission . . . .

6

Trial Tr. at 144:16 – 145:3, 146:2–8 (Mar. 9, 1994) (A-1602–04) (emphasis added).[2] As far as the mental state required for a conviction on the murder charge, the judge instructed that the jury must be satisfied that "the defendant, his accomplice *or co-conspirator* did so with the specific intent to kill and with malice." Trial Tr. at 135:24 – 136:1 (Mar. 9, 1994) (A-1593–94) (emphasis added). The conjunction 'or' suggested that Hannibal could be convicted regardless of his own mental state if his co-conspirator had the specific intent to kill with malice, and the jury requested clarification. In response, the judge modified the mental state instruction so that the jury had to be satisfied "that he, *the person who is being evaluated*, did so with [the] specific intent to kill and with malice." Trial Tr. at 6:1–3 (Mar. 10, 1994) (A-1620) (emphasis added).

The jury found both Hannibal and Gregory guilty of conspiracy and first-degree murder for the killing of Peter LaCourt. On March 11, 1994, the jury sentenced Hannibal to death and Gregory to life in prison.

By way of postscript, the Commonwealth, after introducing evidence associating Hannibal and Gregory with Robinson's death and securing guilty verdicts against both men for LaCourt's murder, prosecuted two other men for murdering Robinson and the other women in the sixth-floor apartment. One of the two men convicted of those murders was the man identified by Richardson as being in Gregory's apartment during the planning.

---

[2] The trial judge also instructed that:

> A defendant does not become an accomplice merely by being present at the scene or knowing about the crime. He is an accomplice if *with the intent of promotion or facilitating a commission of the crime* he encourages, requests, solicits or commands the other person to commit it or he aids, agrees to aid or attempts to aid the other person in planning or committing it.

Trial Tr. at 133:3–10 (Mar. 9, 1994) (A-1591) (emphasis added).

## II. PROCEDURAL HISTORY

After receiving a death sentence for first-degree murder, Hannibal took an automatic appeal to the Supreme Court of Pennsylvania. *See* 42 Pa. Cons. Stat. §§ 722(4), 9711(h)(1); Pa. R. App. P. 702(b), 1941. He made five arguments, three of which are relevant to this case. First, he asserted that the jury instructions were erroneous under Pennsylvania law. Second, he contended that trial counsel was ineffective for failing to subpoena prison housing records. And third, he argued that it was fundamentally unfair for the Commonwealth to introduce evidence connecting him to Robinson's murder. The Pennsylvania Supreme Court independently reviewed the sufficiency of the evidence for the first-degree murder conviction, and then rejected each of Hannibal's arguments. *Commonwealth v. Hannibal*, 753 A.2d 1265, 1271, 1272 n.11 (Pa. 2000).

Hannibal then filed a separate civil action to collaterally challenge his conviction and sentence under the Pennsylvania Post Conviction Relief Act. *See* 42 Pa. Cons. Stat. §§ 9541, 9542. In addition to reiterating several of his previous arguments, including the three identified above, Hannibal claimed that the Commonwealth violated its duty to disclose exculpatory materials under *Brady v. Maryland*, 373 U.S. 83 (1963), by not producing the correspondence between the prosecutor and the prison director as well as the prison housing records for Cell 50 at the PICC. The Court of Common Pleas denied that petition. Hannibal appealed that ruling to the Pennsylvania Supreme Court without any success. *See Commonwealth v. Hannibal*, 156 A.3d 197, 203 (Pa. 2016).

In July 2017, Hannibal sought relief in federal court. In his habeas petition under 28 U.S.C. § 2254(a), in the Eastern District of Pennsylvania, he raised eight claims. Some of those challenged exclusively his death sentence. Although it had defended Hannibal's death sentence for over twenty-five years, in February 2020, the Philadelphia District Attorney's Office stipulated that Hannibal was deprived of effective assistance of counsel

8

at the sentencing phase of trial. In response, the District Court vacated the death penalty, but on the Report and Recommendation from the Magistrate Judge, it denied all of Hannibal's challenges to his conviction. Through a timely appeal, Hannibal now invokes the appellate jurisdiction of this Court to contest that final decision. *See id.* §§ 1291, 2253(a); Fed. R. App. P. 4(a).

## III. DISCUSSION

On appeal, Hannibal raises four collateral challenges to his conviction. He argues that under *Brady*, the Commonwealth should have disclosed two sets of exculpatory materials: the prison housing records for Cell 50 at the PICC and the correspondence between the prosecutor and the prison director regarding Hannibal and Buigi's cell assignments. Hannibal also contends that the trial court committed a due process error by admitting evidence connecting him to Robinson's death. Hannibal further asserts that at the close of trial, the court violated his due process rights by giving improper instructions to the jury about the mental state requirement for first-degree murder. Finally, Hannibal argues that these errors compound so that their cumulative effect compels habeas relief.

As codified in statute, the Anti-Terrorism and Effective Death Penalty Act of 1996, commonly abbreviated as 'AEDPA,' supplies the standard of review for a habeas petition brought by a person held in custody pursuant to a state-court judgment. *See generally* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, 110 Stat. 1214, § 104 (codified in relevant part at 28 U.S.C. § 2254). That standard, which may be referred to as 'AEDPA deference,' constrains the scope of federal court review of "any claim that was adjudicated on the merits in the State court proceedings." 28 U.S.C. § 2254(d); *see also Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (characterizing federal-court review of a state-court ruling on the merits as "highly circumscribed"). As to the

9

facts, a federal court will grant relief only if the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). With respect to the law and its application, a federal court cannot grant relief unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). If, however, the claimed violations of federal law were not adjudicated on the merits by a state court, and review in federal court is not otherwise foreclosed (such as by a failure to exhaust or procedural default), then AEDPA deference does not apply, and a federal court reviews the claim *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

## A.    The *Brady* Claims

Hannibal leads with the contention that exculpatory documents regarding the prison housing arrangements were withheld from him in violation of *Brady*. Specifically, he claims that he was owed the prison housing records about Cell 50 and the correspondence between the prosecutor and the prison director. The common premise for both *Brady* claims is that the documents would have been material to Hannibal's case by allowing him to undermine Buigi's testimony that he and Hannibal were cellmates at the PICC in late October and early November 1993. *See generally Giglio v. United States*, 405 U.S. 150, 154 (1972) (explaining that the duty under *Brady* to disclose exculpatory evidence includes impeachment evidence); *Simmons v. Beard*, 590 F.3d 223, 234 (3d Cir. 2009).

In ruling on Hannibal's PCRA petition, the Pennsylvania Supreme Court did not consider the merits of his *Brady* claims.[3]  But it did consider and reject Hannibal's

---

[3] The Pennsylvania Supreme Court held on collateral review that Hannibal waived his *Brady* claims by not raising them on direct appeal. *Hannibal*, 156 A.3d at 210; *see* 42 Pa. Cons. Stat. § 9544(b).  But Hannibal filed his direct appeal in 1997, before the 1998 decision in *Commonwealth v. Albrecht*, 720 A.2d 693, 700 (1998). Pre-*Albrecht*, waiver

10

ineffective assistance claim premised on counsel failing to subpoena the Cell 50 records. It determined that those records were "inaccurate on their face, containing several obvious errors" – including showing multiple prisoners occupying one bed while the other bed went unused. *Hannibal*, 156 A.3d at 210. Thus, the Pennsylvania Supreme Court concluded that the records would have had no impeachment value. *Id.*

That conclusion qualifies as an on-the-merits ruling on the materiality element of the *Brady* claim. That is so because both claims have a common legal requirement – a reasonable probability that the outcome would have been different if Hannibal would have had access to the records. *Compare Lewis v. Horn*, 581 F.3d 92, 107 (3d Cir. 2009) (explaining that the prejudice prong of an ineffective-assistance-of-counsel claim requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)), *with Strickler v. Greene*, 527 U.S. 263, 280 (1999) (explaining the materiality element of a *Brady* claim requires a showing of a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)))). And in this instance, both claims turned on the same factual issue – the impact of not having the Cell 50 records to impeach Buigi on Hannibal's trial. Based on the legal congruence of the claims and the common underlying factual premise, the Pennsylvania Supreme Court's resolution of the ineffective-assistance-of-counsel issue qualifies as an on-the-merits ruling with respect to the materiality element of Hannibal's *Brady* claim. *See Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007) (applying AEDPA deference when the state court did not

---

under Pennsylvania law was "not an adequate basis for a finding of procedural default." *Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009).

11

address the merits of the claim "in the ordinary sense" but instead "examined the merits in the context of the prejudice prong of an ineffective assistance" claim).

Thus, under AEDPA deference, the question narrows to whether the Pennsylvania Supreme Court reasonably concluded that the Cell 50 records would not have altered the outcome of the trial. It did. The Cell 50 records are facially inaccurate and would have minimal, if any, impeachment value. The court also considered the contrary testimony of the guards, who both remembered Hannibal and Buigi sharing Cell 50 during the relevant timeframe. It also recognized Hannibal's testimony – in contradiction to the prison housing records – that he was housed in Cell 50 (although he disputed sharing it with Buigi). So, it was reasonable for the Pennsylvania Supreme Court to conclude that any attempted impeachment efforts using the inconclusive Cell 50 records would likely not have changed the jury's mind.[4]

The portion of Hannibal's *Brady* claim premised on not receiving the correspondence between the prosecutor and the prisoner director also fails. On *de novo* review (because the Pennsylvania courts did not consider this issue), *see Cone*, 556 U.S. at 472, the correspondence was not material. It related to Hannibal and Buigi's incarceration at a different penal institution at a different time (August through early October of 1993, not late October through November of 1993), so it provided no credible basis for impeaching Buigi. Thus, Hannibal's lack of that information did not alter the outcome of his trial or appeal.

---

[4] The Pennsylvania Supreme Court also included an 'even if' argument – even if the Cell 50 records had some impeachment value, their withholding was not consequential because they would have provided a basis for impeaching Hannibal's own testimony. That is an uncertain proposition because it assumes that Hannibal would still have testified if he had the Cell 50 records. But given its determination that the Cell 50 records provided no meaningful basis for impeachment, it is not necessary to evaluate the reasonableness of that secondary basis for the Pennsylvania Supreme Court's determination.

### B. The Introduction of Evidence Associating Hannibal with the Murder of Tanesha Robinson

Hannibal also argues that the trial court violated his due process rights by allowing the introduction of evidence linking him to Robinson's murder. On direct appeal, the Pennsylvania Supreme Court addressed that challenge and upheld the admission of the evidence. *Hannibal*, 753 A.2d at 1272 n.11 (A-560). That ruling therefore receives AEDPA deference.[5]

Under that standard, the Pennsylvania Supreme Court's ruling was not "contrary to" or "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). After reviewing Hannibal's claim that his "trial was unfair" based on the introduction of evidence associating him with Robinson's murder, the Pennsylvania Supreme Court upheld the trial court's ruling, reasoning that the evidence was properly admitted as part of the history of the case and to show consciousness of guilt. *Hannibal*, 753 A.2d at 1272 n.11 (A-560); *see also id.* (explaining that counsel was not ineffective for failing to object to the introduction of this evidence because there was "no basis to object . . . ."). And according to the United States

---

[5] On collateral review, the Pennsylvania Supreme Court divided on the question of whether the due process issue concerning the admission of this evidence had been previously litigated on the merits. *Hannibal*, 156 A.3d at 203, 234, 236 (A-703, A-730, A-731). Despite the fractured reasoning, that court ultimately affirmed the PCRA court's ruling that the issue had been litigated on direct appeal and was therefore not cognizable on PCRA review. *See* 42 Pa. Cons. Stat. § 9544(a)(2); *see also In re Int. of O.A.*, 717 A.2d 490, 496 n.4 (1998) (explaining that, "[w]hile the ultimate order of a plurality opinion . . . is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority"); A-670–71 (PCRA opinion). So, although the Pennsylvania Supreme Court's decision on collateral review was later than its ruling on direct appeal, it is not the relevant decision for purposes of AEDPA deference. *See Bond v. Beard*, 539 F.3d 256, 289 (3d Cir. 2008) (holding that federal courts should look to "the state courts' last reasoned opinion on" an issue if a higher state court either does not address or does not "supplement[] in a meaningful way" the reasoning relevant to that issue).

Supreme Court, the admission of evidence of another crime is not "so extremely unfair" as to violate "fundamental conceptions of justice" where it was "at least circumstantially valuable in proving petitioner's guilt" and the judge provided a limiting instruction. *Dowling v. United States*, 493 U.S. 342, 352–53 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). In this case, the admission of evidence regarding Hannibal's involvement in Robinson's murder was important to corroborating Buigi's testimony that at Hannibal's direction, his "boys" "took care of" the witness, and it evidenced Hannibal's consciousness of guilt. Trial Tr. at 122:24–25 (Feb. 28, 1994) (A-869). Thus, it was at least circumstantially valuable in proving Hannibal's guilt. The more prudent course may well have been for the trial court to have excluded evidence of the other two victims and the presence of an infant. But under AEDPA deference, with the two limiting instructions from the trial judge that the information should be considered only for consciousness-of-guilt purposes, the Pennsylvania Supreme Court's rejection of this challenge was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

## C. The Jury Instructions on Specific Intent for First-Degree Murder

Hannibal argues that the jury instructions violated his right to due process by minimizing the Commonwealth's burden of proof, specifically by allowing a finding that he was guilty of first-degree murder based on the intent of his codefendant, Gregory. *See Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997) (explaining that jury instructions that "relieve[] the Commonwealth of the burden of proving beyond a reasonable doubt . . . every element of the offense" violate due process); *see also Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011). On collateral review, the Pennsylvania Supreme Court upheld the jury instructions, which would normally implicate AEDPA deference

14

considerations. But when a state court's rationale is less than clarion, it is permissible to sidestep AEDPA deference if the claim would fail under *de novo* review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." (citation omitted)). And here, that path of *de novo* review is appropriate.

At the time of Hannibal's trial, a requirement for first-degree murder under Pennsylvania law was that "each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder—the specific intent to kill." *Commonwealth v. Wayne*, 720 A.2d 456, 464 (1998) (emphasis omitted); *see also Commonwealth v. Bachert*, 453 A.2d 931, 935 (1982). And Hannibal's contention that the initial jury instruction and the follow-up clarification did not clearly instruct the jury on that point of law is non-trivial.[6]

Still, any error in the instructions on first-degree murder would have been harmless because in convicting Hannibal of conspiracy to commit murder, the jury had to find that he acted with the specific intent to kill. *See Bronshtein v. Horn*, 404 F.3d 700, 712 (3d Cir. 2005) (explaining that an error in a jury instruction is harmless unless "the error had substantial and injurious effect or influence in determining the jury's verdict" (quoting

---

[6] The initial instructions could have conveyed to the jury that Hannibal could be guilty of first-degree murder even if only co-defendant Gregory had the specific intent to kill. Trial Tr. at 135:18–136:1 (Mar. 9, 1994) (A-1593–94) (setting forth the third element of first-degree murder by listing the subjects disjunctively, as the defendant, "his accomplice *or* co-conspirator" who must have killed the deceased "with the specific intent to kill and with malice" (emphasis added)). The clarifying instruction, which stated that the mental state was required of "the person who is being evaluated," although seemingly curative, did not specify whether 'the person being evaluated' referred to Hannibal or his co-defendant, Gregory. Trial Tr. at 5:19–6:3 (Mar. 10, 1994) (A-1619–20).

15

*Smith*, 120 F.3d at 417)). The trial court's instruction for conspiracy to commit murder expressly stated that guilt depended on a specific intent to kill: "to find a defendant guilty of conspiracy to commit a crime, you must be satisfied initially that . . . the defendant, a defendant, his co-conspirator or accomplice [conspired] with the intent of promoting or facilitating commission of the crime." Trial Tr. at 144:16–145:3 (Mar. 9, 1994) (A-1602–03). Although that instruction was also in the disjunctive, the trial court later made clear that co-conspirators and accomplices must act with specific intent. It explained that the jury could find guilt as a conspirator if it was "satisfied beyond a reasonable doubt first that the defendant agreed with the others to commit the crime . . . and *that the defendant agreed with the intent* of promoting or facilitating [its] commission . . . ." Trial Tr. at 146:3–8 (Mar. 9, 1994) (A-1604) (emphasis added). And for guilt as an accomplice, the trial court further explained that a defendant "is an accomplice if *with the intent of promotion or facilitating a commission of the crime* he encourages, requests, solicits or commands the other person to commit it or he aids, agrees to aid or attempts to aid the other person in planning or committing it." Trial Tr. at 133:5–10 (Mar. 9, 1994) (A-1591) (emphasis added). So, under any scenario, to find Hannibal guilty of conspiracy to commit murder, the jury had to conclude that he had the specific intent to kill LaCourt.

Thus, even if the instructions on first-degree murder were deficient as to the need for Hannibal to have the specific intent to kill LaCourt, the instructions viewed in their entirety reveal that, in finding Hannibal guilty of conspiracy, the jury must have found that Hannibal had acted with a specific intent to kill. Any error in the instruction for first-degree murder would therefore not have had "a substantial and injurious effect or influence in determining the jury's verdict." *Bronshtein*, 404 F.3d at 712 (quoting *Smith*, 120 F.3d at 417); *see also id.* at 710 (holding that even in the presence of misleading jury instructions

16

on the specific intent requirement for first-degree murder, a guilty verdict on a charge of conspiracy to commit murder, for which the jury was required to find a specific intent to kill, sufficed to render the error harmless).[7]

### D. Cumulative Error

Finally, Hannibal invokes the cumulative error doctrine to argue that the combined effect of the trial court's errors – even if independently harmless – deprived him of a fair trial. Under the cumulative error doctrine, "errors that are not individually reversible can become so cumulatively," *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019), if they "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *Id.* (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)). Errors can accumulate either by virtue of their relatedness, such that they "amplify each other in relation to a key contested issue in the case" or by virtue of their combined magnitude such that, when aggregated, "unrelated errors sufficiently undermine[] confidence in the outcome of the trial." *Id.* (first quoting *Cargle v. Mullin*, 317 F.3d 1196, 1221 (10th Cir. 2013), then quoting *Grant v. Trammell*, 727 F.3d 1006, 1026 (10th Cir.

---

[7] The holding in *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005), does not alter this outcome. In that case, the instruction informed the jury that it could convict the defendant of a substantive offense, including first-degree murder, if that "particular crime, *while it may differ from the agreed crime*, was committed by the coconspirator in furtherance of his and the defendant's common design." *Id.* at 428 (emphasis added). Those instructions, even when taken as a whole, did not ensure that the jury had found the requisite specific intent to kill because the instructions allowed the jury to convict of first-degree murder based on the accomplice's intent to commit a different crime. But here, as in *Bronshtein*, there was no such possibility. The jury instructions in both cases referenced the need for the specific intent to commit the agreed upon crime, which was first-degree murder. And *Laird* cannot alter the holding in *Bronshtein*, which was decided first. *Compare Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. Apr. 14, 2005), *with Laird v. Horn*, 414 F.3d 419, 428 (3d Cir. July 19, 2005); *see also Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 471 (3d Cir. 2017) ("[W]here two precedential opinions are in 'unavoidable conflict,' the earlier opinion controls[.]" (citation omitted)).

2013)).  Either way, cumulative errors do not warrant reversal where the "remaining evidence of guilt [is] overwhelming."  *Id.* (cleaned up) (quoting *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994)).

Here, the Pennsylvania Supreme Court rejected Hannibal's claim of cumulative error, *Hannibal*, 156 A.3d at 234, and so AEDPA deference applies.  That conclusion was not unreasonable in light of the ample evidence supporting Hannibal's responsibility for LaCourt's death.

*De novo* review confirms that result.  The only potential error relates to the jury instructions.  Yet, with only an isolated instance of potential error, and without any combination of errors, there is no basis to compound errors, and principles of cumulative error – under either the relatedness or the combined magnitude methods – do not apply here.

## IV.   CONCLUSION

For the foregoing reasons, we will affirm the District Court judgment denying habeas relief on the grounds challenged herein.

18